JAMES SMITH vs. JOSEPH Y. BROWN — Appeal from Comal County.

A fictitious case, brought for the purpose of obtaining the opinion of the court on the matters presented by it, is a contempt; and will subject the parties and their attorneys to the severe animadversion of the court.

Wagers, though recoverable at common law, if not on subjects contrary to public policy, afford no ground of action when entered into simply to obtain a judicial opinion upon an abstract question of law.

The official acts of public functionaries are not proper subjects for wagers; and it would be doing great injustice to such functionaries to allow their conduct to become the subject matter of a gambling contract.

The facts of this case are fully stated in the opinion of the court and the arguments of the counsel.

HAMILTON and GREEN for appellant.

The judgment below was for the appellee, and he relies upon its affirmance here, on the ground of the unconstitutionality of the last legislature apportioning senators and representatives among the several counties of the state, according to the requirements of the constitution.

The presumption must always be in favor of the validity of law, if the contrary is not clearly demonstrated. [4 Dall. 14; 1 Cond. Rep. 211.]

The 92d section of the district court act, passed at the first session of the legislature, provides "that the printed statute books of the state shall be evidence of the act therein contained;" which, under the pleadings and proofs submitted by the parties, will entitle the appellant to a reversal of the judgment. [Acts 1st Leg. 388, sec. 92.]

The objection to the validity of the law in question, upon the ground of repugnance to the constitution of the state, is not well taken in this case. A party who sets up the unconstitutionality of a law must show that it has infringed upon, and is in derogation of, his private rights; whereas, in this case, the appellee neither proves or charges any such effect. [1 Litt. 16; 6 Cranch, 127; 2 Brock. 447.]

If, then, the appellee cannot set up the want of validity of said law, upon the ground of its repugnance to the constitution, it follows that he cannot go behind the law to inquire into the time, manner and circumstances of its passage and approval. And if he could, an act, such as the legislature have a right to pass, would not be unconstitutional merely on account of irregularity in the manner of its passage — the constitutional provisions, in this respect, being only declaratory and directory. [1 Cond. Rep. 211.]

HANCOCK for appellee.

This suit was brought at the last term of the district court, by appellant, on an obligation made to him by appellee, for the sum of one hundred and fifty dollars, payable the 6th of November last, if by that time appellant furnish at the town of New Braunfels, any law showing the next legislature of the state of Texas will be composed of seventy members in both branches. Appellant alleges he performed the consideration by producing, at the time and place mentioned, a law passed by the second legislature of the state, being an act entitled "An act to apportion senators and representatives of the legis-

lature among the several counties according to the require-
ments of the constitution."

Appellee filed his answer, denying that the purported act
produced by appellant was a law:

First, because it was not passed in accordance with the con-
stitution; and, with this plea, files a certified copy from the
secretary's office, of the act filed there, with a note thereon, of
Hon. John A. Greer, president of the senate, showing that it
was not signed by him till after the final adjournment.

Second. He denies that any such law as that presented by
appellant was ever passed by the second legislature; but that
the same was procured to be published as a law, through fraud.

Third. That no such act as the one produced was ever en-
rolled, or reported upon, by the committee on enrolled bills, as
correctly enrolled; and that this was necessary to have been
done, as directed by the rules of the house of representatives,
etc.; which are also filed as part of the answer.

Fourth. That the same was never signed by the speaker of
the house or the president of the senate, when they had any
authority to do so.

Fifth. That the said act never received the sanction of both
houses of the legislature.

Sixth. That said act did not receive the approbation of the
governor till after the adjournment of the legislature; nor at a
time when he could rightfully approve bills.

Seventh. That it excludes several counties from represen-
tation.

Judgment in favor of the defendant, from which plaintiff
appealed.

The facts certified up show that, in the court below, the
plaintiff, in support of his right to recover, produced in evi-
dence the obligation sued on, and an act of the last legislature,
published among the printed laws of the state, showing that
the next session of the legislature will be composed of seventy
members.

Defendant proved, from the journals of the house and senate,
that the law introduced in evidence by the plaintiff differs

from the act voted upon by the legislature for this purpose, in this: that the counties of Harrison and Upshur were stricken out of the sixth senatorial district in the act really voted on; and by the chairman of the enrolling committee, that the act introduced by plaintiff was never reported by said committee as correctly enrolled, nor any report made thereon by said committee; and by the said chairman and the assistant clerk of the house, that the same was not enrolled until the 21st of March, 1848, which was the day after the final adjournment; and by the same witness, that the said act was not, until that day, signed by the speaker and president; by the secretary of state, that the said act was deposited in his office on the 21st of March, by the enrolling clerk of the house; that it was afterwards taken out of his office by some one, to him unknown, and on the same day returned by the governor's private secretary, signed by the speaker, president, and the governor's approval thereon. The note of the president of the senate, appended to the act at the time of signing it, and one addressed to the governor by the speaker of the house, attested by the chief clerk, dated 21st March, 1848, informing him that he did not sign said act till then, were also in evidence. Shown by the bill, made a part of defendant's answer, that the counties of Medina, Gillespie, Kaufman, etc., were not included in said apportionment bill; and that there was a number of qualified electors residing in said counties. That the county of Caldwell, a new county taken from the counties of Bastrop and Gonzales, was attached to the county of Travis.

The defendant, in his answer, admits that the plaintiff produced an act appearing among the published laws of the second legislature, which shows the next legislature will be composed of the number of seventy in both branches; but denies that the produced act is a law, upon two general grounds. The first ground based on matters accruing before its publication; the second, on the constitutionality of the act in its provisions.

On the first ground taken by the pleas filed by the defendant, denying that the act presented is entitled to the consideration of a law, arises the question of the power of the courts to go be-

hind the printed statute book, to ascertain whether an act has been passed in sufficient accordance with the necessary formalities to make it a law.

It has not often occurred that courts have been called upon to exercise this power of going behind the law, published under the supervision of the authorized officers of state, to inquire into matters that transpired during the progress of its passage, in order to come to their determination of its validity. Cases have arisen where this power has been invoked; and the course pursued has invariably been, as far as I am able to learn, such as the genius of the age and the character of the institutions of our government would not merely warrant, but seem to demand. In a government boasting of foundation on laws that extend to all the branches and departments thereof, equally to the legislative as others, the boast were idle, indeed, if we deny the existence of a power to carry into execution these rules for the correction of evils, wherever found to exist. No other course can ever keep up and perpetuate free institutions than a vigilant and energetic restraint against all encroachments of power, from whatever source they may proceed, or whether caused by mistake or design. To limit the power of inquiry of courts to the law as it may appear upon the statute book, would leave a space through which oppression and abuse of the most grievous character might be introduced, without a corrective power to restrain or protect. But courts, in similar instances, have not considered themselves so imbecile, or their powers so limited; and when bound to take notice of a public act, have determined the question by an inspection of the record; for *nul tiel record* cannot be pleaded to a statute.

In the case of Purdy *vs.* The People [4 Hill's Rep. 384], Walworth, chancellor, and Paige, Franklin, and others, senators, lay down the doctrine, that for the purpose of ascertaining whether an act was passed as a majority bill merely, or by a vote of two-thirds, courts may look beyond the printed statute book to the certificate upon the original engrossed bill on file with the secretary of state.

And in the same case, it is laid down that courts may resort

to the journals kept by the two houses to ascertain whether an act has been passed by a vote of two-thirds [see pp. 390, 394 and 404 of the above reports], where the power of courts to look beyond the printed law to ascertain its validity is clearly and expressly established, in the opinions of the chancellor and the several senators; and also in the opinion delivered by Justice BRONSON, when this case was before the supreme court, the same power is unequivocally asserted. [2. Hill's Reps. 31 et seq.]

The opinions in this case, and the number of authorities cited by the learned judges, seem to put the question of the existence of the power at rest.

In support of the position assumed by the several judges in this case, the following authorities are cited: Dwarr. on Stat. 630, 665; Com. Dig. Tit. "Parliament," R. 5; The Prince's Case, 8 Coke's Rep. 28; Rex vs. Robotham, 3 Burr. 1472; and also a number of cases decided by the New York courts are cited as recognizing the power.

If, then, it be established that it is within the province, and even the duty, of the court to look beyond the printed law to the records attesting its passage, and entitling it to the consideration of authority, the facts before the court below show that the passage of this act was not only signalized by unprecedented irregularity, but a wanton disregard of the necessary prerequisities of both form and substance, to entitle legislative acts to the force of laws.

In the first place, it is shown by the journals of the two houses that the act in question differs from the one voted upon by the legislature; or there is a variance in the act as published from that before the senate, as appears in the sixth senatorial district. [See Journals of the Senate, pp. 643, 649 and 651, where it appears the counties of Harrison and Upshur were stricken out of that district, whereas they now appear in the law as forming a part of it.]

From a certified copy of the bill deposited in the secretary of state's office, forming a part of the defendant's answer, it is shown it was signed by the presiding officers of the respective

houses, with this variance from the act really voted on by the legislature. Whether their signatures to acts that have not passed the legislature at all, or to acts differing in details from the ones really passed, though having the same object in view, adds any validity thereto, seems hardly to admit of a question. Take the first supposition above to be before the court, that the presiding officers of the legislature have really signed an act upon any given subject which that body had never acted upon in any way whatever, would any one, for a moment, contend that the mere fact of the signatures appearing to such an act woul'd be sufficient to supply the place of all necessary evidence of legislative action? The bare mention of such a doctrine shows it too monstrous to be seriously entertained under any conceivable circumstances. If the presiding officers could not fashion forth an act entire, with the force of a law, how far can they vary one really passed, by changes and alterations after its final passage, by their signatures? If the change appears, as in the present instance, to have· been occasioned by some means between the time an act is finally acted upon by the vote of the legislature and the signing by the respective officers, how slight soever the change may have affected the provisions of the act, it is as if not signed by them at all. Art. 3, section 20 of the state constitution provides that "every bill, having passed both houses, shall be signed by the speaker and president of their respective houses." It cannot be contended that if a bill may have undergone some change in its provisions before it is signed as directed by the above article, that still the speaker and president sign the act literally as voted upon (it being out of their power to alter or change), that the changes will be disregarded, and the bill remain in force in its original shape. This would be productive of too great uncertainty, and lead to building up intendment upon intendment, till there would not be left a traceable concurrence between any of the departments of the law-making power. The signatures of the presiding officers is, in part, the evidence that assures the executive that a bill is the act of the legislature; and to say that the governor's approval has the same intend-

ment back to the literal bill voted upon, would be to make him approve bills without knowing what they were.

Under the provisions of the 13th section, 3d article of the state constitution, power is given to each house to determine the rules of its own proceedings, etc. With a view to avoid the danger alluded to, from alterations made either by mistake or design, a set of rules were adopted, well suited to this end, and which, if observed, would effectually guard against fraud, imposition or mistake. Among other things provided by the joint rules and orders of the two houses, the

6. Provides, "After a bill shall have passed both houses, it shall be duly enrolled on paper by the enrolling clerk of the house, or secretary of the senate," etc.

7. When bills are enrolled, they shall be examined by a committee of two from each house.

8. After examination and report, each bill shall be signed in the respective houses, first by the speaker of the house of representatives, then by the president of the senate.

9. After a bill shall have been thus signed in each house, it shall be presented by the said committee to the governor for his approbation, etc.

The facts show that none of the above rules were complied with at any time before the final adjournment of the last legislature. The question arises, on each rule, as to the power of the authorized persons to perform the duty therein designated after the adjournment? And whether any act of the legislature can become a law, in the absence of a compliance with any one of them during the existence of the session?

There are several grounds upon which a negative answer would be given to both of the above propositions. Art. 3, section 14 of the constitution provides that "each house shall keep a journal of its own proceedings," etc. In order to facilitate the business of the legislature, certain officers are appointed to perform the duties prescribed in the foregoing rules; and during the terms of their offices constitute a part and parcel of the legislature — acting as agents or officers, under the supervision of their respective houses; whose acts, when

adopted, become those of the legislature as much as any act done by either house.

The mere enrolling, by the clerk appointed for that purpose, a bill or act, is not of itself any evidence that it is the expressed will of the representatives. Before it can be regarded as such, it must be reported by the committee appointed for that duty, and their report adopted — each member examine for himself — that it is correctly enrolled, or some other satisfactory mode pursued to that end. Until such recognition of its correct enrollment is in some way manifested, the signing of the presiding officers would be unauthorized.

The validity of the acts of these officers of the legislature, being made to depend upon the recognition of their correctness by the respective supervisors in their progress, and the officers being but creatures of the legislature for the session, all their connection with that body ceased *eo instanti* with the adjournment, and any after act of theirs would be a nullity.

If the foregoing view of the character and power of the officers of the legislature be correct, any act done by them, after the final adjournment, would add no more force to a bill than if it had remained unperformed.

The section of the constitution requiring each house to keep a journal of its proceedings, just referred to, seems so mandatory in its character as to preclude the idea of the existence of a law, without some corresponding evidence of its passage can be found upon the journals. For the authority of the courts to determine upon the proceedings had by legislatures, in passing acts, see Com. Dig. Tit. Parliament, R. 4, R. 5, and New York authorities before cited.

The facts established by the journals of the two houses, and the parol evidence before the court below, proving positively, what the journals do negatively, show it impossible for the governor to have approved this act till after the adjournment. As the approval is in blank, we have no means, except by parol evidence, of ascertaining the precise time at which the approval was made. The 17th section of article 5 of the constitution

provides for bills presented to the governor, one day before the final adjournment, becoming laws, but makes no provisions for those that may be presented after that time (the adjournment). In order for any act to become a law, as is shown in Com.'s Dig. Tit. above, and the authorities there cited, there must appear a concurrence of the house of representatives, the senate and the executive. How the governor could concur with the two houses after they had adjourned, and the members gone to their respective homes, seems past conception. There does not appear any difference, in principle, in the power of the governor to approve a bill one day after the adjournment and doing so now.

The defense set up in the court below to the act, on the ground that it was in conflict with the direction of the constitution, specifies the provisions in the act attaching new counties to those from which they have not been taken, and excluding others from representation altogether, as instances of conflict with the constitution. The whole bill is included in the answer, and properly comes under the supervision of this court, in every particular, whether specifically pleaded below or not.

Article 7, section 34, constitution, directs that every new county, as to the right of representation, shall be considered as part of the county or counties from which it was taken, until entitled by numbers to the right of separate representation.

This provision is, in several instances, directly violated by annexing new counties to others of which they had formed no part; and more censurably violated by associating new counties together, and forming separate representative districts. This is designated more censurable because it betrays a studied aim to evade the provisions of the constitution.

Another feature of this bill presents such a striking inconsistency with other acts of the same legislature, that if one were left solely to form his conclusion from the acts themselves, he might hesitate to acknowledge them the legislation of the same body. Among other counties left out of the bill entirely, is the whole judicial district of Santa Fe, denied a single voice in the senate — a section of the state that previous

24

acts show the *amiable* determination of taking into full fellow ship. The above section of the constitution seems so plain and clear, and the sense so distinct and perfect, that there is no ground left for any other interpretation than that which naturally arises on the plain, common-sense acceptation of words used. Judge Story says, in speaking of the constitution of the United States (and his language is equally applicable to ours): "The people adopted the constitution according to the words of the text, in their reasonable interpretation, and not according to the private interpretation of any particular man." [1 Story's Com. on Con. 392, and note.] Again he remarks: "When the words are plain and clear, and the sense distinct and perfect arising on them, there is generally no necessity to have recourse to other means of interpretation. It is only when there is some ambiguity or doubt arising, from other sources, that interpretation has its proper office." [Id. p. 384.] The words used in our state constitution fall properly in the class contemplated by the above commentator. The rule here laid down was strictly followed by the supreme court of the late republic in the case of Stockton *vs.* Montgomery. [Dallam's Dig. p. —; Peters' Dig. p. 558, and cases cited.]

In conclusion, I would respectfully remark that a dissatisfaction with the general provisions of this bill exercises not the slightest influence over those who ask the court to pass upon its constitutionality. The complaint may have been made, that some sections of the state have suffered an unfair diminution of representation in the general reduction. And were it the case, it would not be a proper subject for judicial determination. Though it is believed that this bill distributes the members of the legislature among the several portions of the state, according to the population, with as much equality as is practicable. But it is alone upon the insufficiency of the act, as shown from the journals and records of the two houses, and its conflict with the provisions of the constitution, that appellee places his right to an affirmance of the judgment of the court below.

Mr. Justice LIPSCOMB delivered the opinion of the court.

This suit was instituted on an instrument of writing, signed by the defendant, in the following words, that is to say: " I hereby bind and obligate myself to pay Josiah Smith the sum of one hundred and fifty dollars, if he furnish at the town of New Braunfels, by the 6th day of November next, any law of the state of Texas, showing that the next legislature of the said state will be composed of seventy members in both branches, this the 6th day of September, 1848." The plaintiff alleged that he had performed the condition by the production of the law; the defendant denied that the act produced was lawfully and constitutionally passed.

It was manifestly the object of the parties in this suit to obtain a judicial decision on the constitutionality of the apportionment act of the last session of the legislature. The suit is not founded on a *bona fide* transaction. It is either an entire fiction, or it is a wager, designed to effect the same object. Fictitious cases are often presented, in the form of a wager, because every wager is not in contravention of law; but every fictitious case is a contempt of the court, and when known to be such, has subjected the parties to the severe animadversion of the court; such as fine and imprisonment. In the matter of R. J. Elsaw, an attorney [3 Barn & Cres. 597, 10 Com. L. 193], a special case was stated for the opinion of the court; the greater part of the statement was fictitious; the court fined the attorney. The defendant, by affidavit, stated his reasons for wishing to obtain the opinion of the court speedily, and that he was not actuated by any corrupt or fraudulent motive, and that he had already incurred an expense of forty pounds in the business. ABBOTT, Chief Justice, said: " It is impossible to pass over a case of this kind without notice; but as it appears that the party before the court did not intend any fraud, and that he has already incurred an expense of forty pounds in the course of the proceedings, the object of the court, which is to prevent the repetition of such a practice in future, will be answered by ordering him to pay a fine of forty pounds, and to be imprisoned until that fine be paid." The case in which

this fiction was attempted to be practiced is entitled Fox *vs.* Dodds; and it will be seen, that, on the suspicion of its being a fiction, the court had directed the master to report whether it was a fiction. And on his report coming in, the case was stopped, and not permitted to proceed farther. In the case of Cox *vs.* Phillips [Hardwicke, p. 237], Lord HARDWICKE held a fictitious action to be a contempt of court, and committed the parties and their common attorney. In Brewster *vs.* Kitchen [Comb. 425], which was a feigned issue, Lord Chief Justice HOLT said, if he had not thought it had been directed out of chancery, he would not have tried it; and his Lordship added, " *Do you bring fob actions to learn the opinion of the court?* " In the case of Fletcher *vs.* Peck, which involved very important principles, Judge JOHNSON said: "I have been very unwilling to proceed to the decision of this case at all. It appears to me to bear strong evidence upon the face of it, of being a mere feigned case. It is our duty to decide on the *rights*, but not on the *speculations*, of parties; my confidence, however, in the respectable gentlemen who have been engaged for the parties, has induced me to abandon my scruples, in the belief that they would never consent to impose a mere feigned case upon this court." [6 Cranch, 147–8.] The same confidence in the respectable gentlemen who have been concerned in this case, in the like manner, forbids the indulgence of a suspicion that they would impose a feigned case on this court. But notwithstanding the language in which the obligation is couched, we cannot place any other construction on it than that it is a wager. No one can believe that it was designed as a compensation for the trouble and labor of procuring the act of the legislature, properly authenticated, from the state department; and the record shows that on the production of the act, as evidence of performance by the plaintiff, the defendant, in his answer, denied that it was a law, because not passed in conformity with the constitution; we shall therefore proceed to consider it as a wager. At common law, wagers were allowed to be a good ground of action, if not on a subject forbidden by law, or contrary to policy or to good morals. The case of

Henkin *vs.* Guerss [12 East, 247], " was an action of *assumpsit* upon a wager of £300, upon the practice of the court, whether a person could be lawfully held to bail on a special original for a debt under £40. It was entered for trial at the last sittings at Guildhall, before Lord ELLENBOROUGH, Chief Justice, who, on hearing the nature of the cause, reprehended the indecorum of the attempt to obtain, in this manner, the opinion of the court upon a question of law or judicial practice, in which the parties had no apparent interest other than what the wager itself created; and his Lordship refused to try the cause, telling the plaintiff's counsel that he might apply to this court upon the subject, if his client felt aggrieved by such refusal." On the question being presented to the other judges, they conversed with the Lord Chief Justice on the propriety of his refusal to try a cause of this description, and his Lordship added, " that courts of justice were constituted for the purpose of deciding really existing questions of right between parties, and were not bound to answer whatever impertinent questions persons thought proper to ask them, in the form of an action on a wager. That though there was nothing immoral in the subject of this wager, yet he considered it as an extremely impudent attempt to compel the court to give an opinion upon an abstract question of law, not arising out of pre-existing circumstances, in which the parties had an interest. And LE BLANC, Justice, said " that if by any other proceedings in court it appeared that, in truth, no such wager had really been made, the court would know how to deal with the case." In this case, as presented by the record, it would be extremely improper to inquire into the conduct of an independent department of the government on an issue in which the parties had no interest other than that created by the wager sued for. The wager is obnoxious to another objection; it implicates the integrity of high functionaries of the legislative department in the discharge of an official trust, in a way in which they cannot be heard in their defense. If those functionaries are justly chargeable with the delinquencies urged in the record against them, such derelictions are not proper subjects of a wager; and

if not, it would be doing them great injustice to allow their conduct to become the subject matter of a gambling contract. The ends of public justice can be attained without resorting to such means. The court below did not err in refusing to give the plaintiff a judgment. That judgment is affirmed.