## *In re* GEORGE BURDICK.

*Filed at Mt. Vernon May 9, 1896.*

1. CONTEMPT—*presenting a fictitious case is a contempt.* To present a fictitious case to a court for the purpose of obtaining its opinion, or for other fraudulent purpose, is a contempt of the court's authority and dignity, and punishable as such.

2. ACTION—*collusive suit—at whose instance dismissed.* While a collusive or fraudulent suit is still pending, either in the court in which it was brought or in an appellate court, it will be dismissed by the court at the instance of any party or person in interest or who may be prejudiced by it, or even at the instance of a stranger appearing as *amicus curiæ,* or by the court upon its own motion, on the fact of collusion being learned.

3. JUDGMENTS AND DECREES—*who may attack fraudulent judgment after term expires.* Application, either by motion or bill in chancery, to set aside a judgment on the ground of fraud or collusion after the term expires and the cause is no longer pending, cannot be entertained unless made by one who is either a party to such judgment or in privity with such party, or by one possessed of property rights or equities which are directly and injuriously affected by the judgment.

4. SAME—*party or privy cannot attack judgment collaterally.* The attack of a party or privy upon a judgment for fraud or collusion must be direct, and cannot be collateral.

5. SAME—*strangers to fraudulent judgment or decree may attack it collaterally.* Strangers to a judgment or decree not coming within the principle of *res judicata* may impeach it for fraud or collusion by a collateral attack upon it whenever it is offered in evidence or sought to be enforced or used against them.

6. SAME—*liability to prosecution not ground on which stranger can move to expunge a decision.* The mere liability of ticket brokers to prosecution under the act of 1875 prohibiting the sale of railroad tickets by unauthorized persons, (Laws of 1875, p. 81,) gives them no standing to impeach for fraud, after term, a judgment and opinion of the Supreme Court in a case to which they were not parties and which affirmed the constitutionality of said act.

CARTER, MAGRUDER and PHILLIPS, JJ., dissenting.

ORIGINAL petition to annul and expunge the judgments and opinions in *People* v. *Burdick,* 149 Ill. 600, and *Same* v. *Same,* id. 611.

RICHARD PRENDERGAST, for petitioners:

The power to vacate its judgment is a common law power inherent in every higher court as a part of its necessary machinery for the administration of justice, and hence it may be exercised without the grant of special statutory authority. Freeman on Judgments, 334, 335; 1 Black on Judgments, 297.

The power to set aside judgments for fraud or collusion is a common law power inherent in all courts of record, and may be exercised after the expiration of the term at which the judgment was rendered, on the application of the party injured. Black on Judgments, sec. 321; *Conn* v. *Whiteside*, 6 Humph. 47; *In re Fisher*, 15 Wis. 511; *Dial* v. *Farrow*, 36 Am. Dec. 267; *Kemp* v. *Cook*, 18 Md. 138; *Taylor* v. *Lindell*, 34 id. 38; *Mayberry* v. *McClurg*, 51 Mo. 256.

The maxim that fraud vitiates everything is applicable to judgments. Upon proof of fraud or collusion in their procurement they may be vacated at any time. Freeman on Judgments, sec. 99; *Cannan* v. *Reynolds*, 5 El. & Bl. 301; *Phillipson* v. *Earl of Egremont*, 6 Ad. & El. 587.

An action not to determine the right in controversy, but to deceive the court and to raise a prejudice against a third person, is unlawful, and punishable as a contempt. Oswald on Contempt, 68.

As to the power and duty of courts in dealing with fictitious suits, and judgments rendered therein, petitioners' counsel cited the following cases: *Smith* v. *Railroad Co.* 25 Ind. 546; Freeman on Judgments, sec. 336; *Galatian* v. *Irwin*, Hopkins, 54; *Fermor's case*, 2 Coke, 77; *Michigan* v. *Banks*, 33 N. Y. 25; *Duchess of Kingston's case*, 20 Howell's St. Tr. 478; *Mitchell* v. *Kintzer*, 5 Pa. St. 216; *Earl of Brandon* v. *Becker*, 3 Cl. & Fin. 479; *Gore* v. *Stackpoole*, 1 Dow, 18; *Sheldon* v. *Patrick*, 1 Macq. 590; *Lord* v. *Veazie*, 8 How. 251; *Wood Paper Co.* v. *Heft*, 131 U. S. 92; *Dakota Co.* v. *Glidden*, 113 id. 223; *Brewster* v. *Kitchin*, Comb. 425; *Purifier Co.*

162—4

v. *Vail*, 4 B. & A. 2; *Cleveland* v. *Chamberlain*, 1 Black, 419; *Gaines* v. *Henen*, 24 How. 615; *Hoskins* v. *Lord Berkeley*, 4 T. R. 402; *Forrest* v. *Railroad Co.* 4 DeG., F. & J. 126; *Cox* v. *Phillips*, Hardw. 237; *In re Elsam*, 3 B. & C. 597; *Smith* v. *Brown*, 3 Tex. 371; *Bartemeyer* v. *Iowa*, 18 Wall. 129; *United States* v. *Flint*, 4 Sawyer, 52.

W. S. Forrest, and M. Rosenthal, *pro se*, S. P. Shope, for respondents.

Mr. Justice Baker delivered the opinion of the court:

One George Burdick was convicted in the Jackson circuit court, upon two indictments, for selling railroad tickets in violation of the act of the legislature approved April 19, 1875, entitled "An act to prevent frauds upon travelers, and owner or owners of any railroad, steamboat or other conveyance for the transportation of passengers." (2 Starr & Curtis' Stat. p. 1951.) Upon each indictment a judgment was rendered against him for a fine of $500. He thereupon sued out writs of error and brought the two cases to this court. The judgments were here affirmed. The cases are reported as *Burdick* v. *People*, 149 Ill. 600, and *Burdick* v. *People*, id. 611. At a subsequent term of the court George M. McKenzie, Levi Salomon, A. J. Geis, S. A. Fishel, E. J. Hunter and Edward List, as *amici curiæ*, presented to this court the petition now before us, and asked that we should strike out, annul and expunge from the record and reports of the court the opinions and judgments in said cases of *Burdick* v. *People*, for the alleged reason that said causes were fictitious and collusive, and that said opinions and judgments were obtained by collusion and by fraud practiced on this court. Along with the petition numerous affidavits were filed which tended to prove the truth of the statements made in said petition. Thereupon a rule was entered, returnable to the then next term of the court, requiring the attorneys of record both for the plaintiff in error and for the defendant in error in said

two cases of *Burdick* v. *People,* and other persons named
in the aforesaid petition as being parties to the alleged
collusion, to show cause why, if any, the opinions and
judgments in question should not be stricken out, an-
nulled and expunged from the record and reports of the
court. Answers and returns to said rule were made by the
several persons against whom the rule was entered, and
the answers and returns were duly sworn to, and were in
denial of the charges made, and were accompanied by affi-
davits of other persons tending to support such denials.

In the view we have taken of the matter it will not
be necessary for us to weigh the testimony found in the
petition and in the answers thereto, and in the affidavits
filed with said petition and answers, respectively, for the
purpose of determining whether or not the prosecutions
against George Burdick were fictitious and collusive.

Upon what footing do the petitioners stand before the
court? They appear as *amici curiæ.* They say that they
are engaged in the business of ticket brokerage, and also
that two of them (George M. McKenzie and Levi Salo-
mon) appear on behalf of the American Ticket Brokers'
Association, and two of them (A. J. Geis and S. A.
Fishel) on behalf of the Guarantee Ticket Brokers' As-
sociation, and three of them (Levi Salomon, E. J. Hunter
and Edward List) on behalf of the Chicago Ticket Bro-
kers' Local Association. They do not show that any
indictment is pending against them or either of them, or
any member of either of said ticket brokers' associations,
for a violation of the statute that was involved in the
decision made in the *Burdick cases.* And what was the
*status* of said *Burdick cases* at the time they presented
their petition to the court? The judgments that had
been rendered against Burdick in the circuit court upon
the two indictments against him had, many months be-
fore, been affirmed by the final judgments and decisions
of this court, and the time limited for filing petitions for
rehearings had long since expired, and the opinions of

this court in said cases published in the official Reports of the court; and, moreover, the amounts due upon said judgments had been fully paid to the officer of the law authorized to receive the same. Besides this, not only the term of the court in the Southern Grand Division, as of which these final judgments were entered, had expired, but the next succeeding term of the court in said grand division had ended fully six months prior to the presentation of the petition to vacate said judgments.

Do the petitioners stand in such attitude as will authorize the court, upon their motion, to expunge from the record and from the reports of the court the said judgments and the opinions rendered in deciding them? It goes without saying that to present a fictitious case to the court for the purpose of obtaining its opinion, or for other fraudulent purpose, is a contempt of its authority and dignity, and the court will in such case, under all proper circumstances, protect itself and litigants, and the rights of third parties, by the imposition of penalties for the contempt and by the dismissal of the fictitious suit or the appeal or writ of error therein, and even by setting aside or affording relief against a collusive and fraudulent judgment, either at or after the term at which it is entered.

It is settled law that while a collusive or fraudulent suit is still pending the court will, at the suggestion of either a party to the record, or a person in interest or who may be prejudiced by the judgment, or even at the instance of a stranger who appears as *amicus curiæ*, or upon its own motion, dismiss such suit out of court. (*Matter of Elsam*, 3 Barn. & Cress. 597; *Coxe* v. *Phillips*, Hardw. 224; *Brewster* v. *Kitchin*, Comb. 424; *Smith* v. *Brown*, 3 Tex. 360.) And the same rule applies where the false and fictitious case is pending in a court of review on appeal or writ of error, and such appeal or writ of error will be dismissed. (*Lord* v. *Veazie*, 8 How. 251; *Bartemeyer* v. *Iowa*, 18 Wall. 129.) And the rule, that is applicable

where both parties collude to get up a case for the opinion of the court is applicable to a case where one of the parties becomes owner of the whole opposing interest and sole party in interest, and is *dominus litis* on both sides. (*Cleveland* v. *Chamberlain*, 1 Black, 419; *American Wood Paper Co.* v. *Heft*, 131 U. S. (Appen.) 92, and 8 Wall. 333; *Dakota County* v. *Glidden*, 113 U. S. 222.) And such rule remains in force during the time allowed for ordering a rehearing and while the case is pending on rehearing. In *Smith* v. *Junction Railway Co.* 29 Ind. 546, an opinion had been filed deciding the questions raised on the appeal, but the court, upon a petition filed by one James Smith, who was supposed to be the appellant, and by one Kent, supported by affidavits, entered an order granting a rehearing and ruling the appellee to show cause why the appeal should not be dismissed. It was then made to appear that the suit was fictitious and that there was no real controversy between the parties to it,—in fact, that the suit was a mere fiction, and intended to affect a real litigation then pending between said Kent and the railroad company. The appeal was thereupon dismissed at the cost of the appellee.

In this State the general rule is, that after the adjournment of the term at which a judgment is rendered, a court, at a subsequent term, has no discretion or authority to set aside such judgment. (*Cook* v. *Wood*, 24 Ill. 295; *Humphreyville* v. *Culver*, 73 id. 485; *Goucher* v. *Patterson*, 94 id. 525.) In *Cook* v. *Wood* it was said, that after the term has expired application should be made to a court of equity for any relief against the judgment as having been obtained by fraud. In 1 Freeman on Judgments (sec. 99) it is said: "The maxim that fraud vitiates everything is applicable to judgments. Whether the maxim is to be given effect on motions to vacate them is more doubtful. In many instances judgments have been vacated for fraud in their procurement upon motions made after the lapse of the term at which they were entered, but we

judge the safer practice is to require relief to be sought by suits in equity."

But in the view we take of the case before us it is immaterial whether the power to set aside a judgment for fraud or collusion is a common law power inherent in all courts of record and that is proper to be exercised after the expiration of the term at which the judgment was rendered, or whether the rule is that after such term has gone by the judgment can be vacated or relieved against only by a suit in equity. We understand the doctrine to be, that the person making application, whether by motion or by bill in chancery, to set aside a judgment after the end of the term in which it was obtained, must either be a party to such judgment or in privity with such party, or be possessed of rights or equities which are directly and injuriously affected by the judgment. There are many cases where the court, at a term subsequent to that at which a judgment or decree was rendered, has interposed to set aside such judgment or decree for either fraud or collusion, but we know of none in which such action has been taken where the party applying for such relief has not been within one or the other of the above mentioned classes of persons. To permit strangers whose rights or interests are not directly and injuriously affected by the judgments or decrees to overturn adjudications to which the parties and those in privity with them make no objections, would encourage litigation and disturb the peace of society.

In *Kemp* v. *Cook*, 18 Md. 130, the party moving to strike out the judgment was a defendant against whom such judgment had been recovered. *Taylor* v. *Lindell*, 34 Md. 38, and *Dial* v. *Farron*, 36 Am. Dec. 267, and 1 McMull. 292, were cases of like character. In *Edson* v. *Edson*, 108 Mass. 590, as well as in *Allen* v. *McClellan*, 12 Pa. St. 328, the complaining party was the defendant against whom a fraudulent divorce had been entered. In *Cannan* v. *Reynolds*, 5 El. & Bl. 301, the action of the court was taken

at the instance of the plaintiffs in the suit. In *Mayberry* v. *McClurg*, 51 Mo. 256, the moving parties were the heirs of the deceased person against whose estate the collusive judgment had been obtained. In *Conn's Lessee* v. *Whiteside*, 6 Humph. 47, the motion to set aside the judgment was made by the landlord deprived of his land, through the fraud of his tenant, by the judgment in ejectment. In *In re Fisher*, 15 Wis. 511, the moving party was the executor and legatee whose rights of property were directly affected by the order fraudulently procured. In *Philipson* v. *Earl of Egremont*, 6 Ad. & El. (N. S.) 587, the plea to the *scire facias* was interposed by the defendant to said writ, who, being a member of the Commercial Packet Company, was personally liable as such for the judgment against the company that had been fraudulently and collusively recovered. In *Galatian* v. *Erwin* and *Cunningham* v. *Erwin*, Hopkins' Ch. 48, the complainant in the cross-bill was an heir who had been deprived of her estate by the actual fraud of her guardian. In *Mitchell* v. *Kintzer*, 5 Pa. St. 216, the person who sought to avail of the fraud was the person who was about to be deprived of her estate by means of such fraud. The case of *United States* v. *Flint*, 4 Sawyer, 42, was a suit in equity brought on behalf of the United States for the purpose of setting aside and annulling a decree confirming title to a rancho, derived from the authorities of Mexico. In *State of Michigan* v. *Phœnix Bank*, 33 N. Y. 9, the State was allowed to impeach for fraud an award based on a fictitious claim, and recover back money paid by it upon such award. In *Earl of Brandon* v. *Becker*, 3 Cl. & Fin. 479, the tenant in remainder was granted relief on his bill to redeem, where his interests had been sacrificed by collusion and fraud among the mortgagee, the tenant for life, the person in whose favor a charge had been created and the purchaser at the sale. *Gore* v. *Stackpole*, 1 Dow, 16, was a direct and successful attack, in 1813, on a collusive foreclosure decree

entered in 1733. The complainant was a tenant in tail whose title had just ripened into possession but had apparently been extinguished by the foreclosure. In *Fermor's case*, 2 Coke, 202, (third part, 77,) there was a direct attack in chancery by the landlord on a record of the Court of Common Pleas, where his tenant had, by fraud and collusion, levied a fine with proclamations to bar the inheritance. The attack was after the right of the landlord would have been barred by the lapse of time allowed by the statute to make an entry or bring his action after the fine, had not the tenant fraudulently continued to pay rent to the landlord after the fine, thereby keeping him in ignorance of that proceeding.

In a direct attack upon a judgment or decree the moving party must be either a party to such judgment or decree or privy to it, or be directly, injuriously and necessarily affected by it, and be possessed of rights or equities that are entitled to be protected from its operation, and the party to the judgment or decree, or privy to it, is restricted to a direct attack by a proceeding instituted for the express purpose of annulling, correcting or modifying such judgment or decree, and cannot make a collateral attack upon it. On the other hand, strangers to the judgment or decree, as to whom it is not *res judicata*, have the right to impeach it for fraud or collusion when offered in evidence or sought to be enforced against them. The domain of collateral attack is then open to them.

*Duchess of Kingston's case*, tried before the House of Lords, (20 Howell's State Trials, 355,) is a leading case upon the question of the right of a stranger to a judgment or decree to impeach such judgment or decree for fraud or collusion. There the judges, speaking through Sir WILLIAM DEGREY, Lord Chief Justice of the Court of Common Pleas, were unanimously of opinion, first, that a sentence in the spiritual court against a marriage in a suit of jactitation of marriage is not conclusive evi-

dence, so as to stop the counsel for the crown from proving the marriage in an indictment for polygamy; but, secondly, admitting such sentence to be conclusive upon such indictment, the counsel for the crown may be admitted to avoid the effect of such sentence by proving the same to have been obtained by fraud or collusion.

In *Sheldon* v. *Patrick*, 1 Macq. 535, (H. L. Cas.) the case was that Sheldon brought suit in 1854 to recover land that he would have inherited had he been legitimate. He was confronted by a judgment of the Court of Sessions of Scotland against his legitimacy, rendered in 1803 and affirmed by the House of Lords in 1808, and he offered to show that the original judgment and the judgment of affirmance were obtained by fraud and collusion. He was a stranger to the judgments, but directly and necessarily prejudiced by them. The decision of the House of Lords was, that where a judgment has been obtained by fraud, and more especially by the collusion of both parties, such judgment, although confirmed by the House of Lords, may be, even in an inferior tribunal, treated as a nullity. Lord BROUGHAM, in delivering his opinion, said that the judgment of the House of Lords was to be "dealt with in the inferior court before which its merits were brought,—that is to say, not the merits of the judgment, but the merits of the parties who had so fraudulently obtained it,—the question being, was it a real judgment or not? For that is the only question in such cases, and that is the question in this case."

The contention of petitioners is, that because they may be subjected to criminal prosecutions under the act of April 19, 1875, that fact gives them a standing in court to vacate and set aside the judgments against Burdick and expunge the opinions of this court from its records. We do not so understand the law. No case has been cited, and we know of none, where a court has vacated a final judgment after the expiration of the term at which it was rendered and the lapse of the time allowed for

ordering a rehearing, except at the instance of a party to the record, or one who was privy to the judgment, or one whose property or rights or equities were directly, necessarily and injuriously affected by such judgment; and sound reason, the stability of judicial proceedings, the peace of society and public policy demand that no rule should be established which would allow mere strangers and volunteers to interfere to upset and over-turn final judgments of courts with which the parties to the record and those in privity with them are content. Here the judgments against Burdick were fully paid and satisfied prior to the commencement of this proceeding, and satisfaction was the last act and end of the judicial proceedings. But even if they were not satisfied, peti-tioners would not be liable for their payment, and it is not suggested that they are, or ever were, in any way a lien upon or affected any property owned or claimed by petitioners. The judgments could not be, and never could have been, either enforced or introduced in evi-dence against petitioners. And even if it were possible · to conceive of a case where it would be otherwise, yet petitioners, being strangers to the judgments and not in privity therewith, would have the full benefit of a col-lateral attack upon them, and it will be time enough to make such attack when they are confronted by them.

No contention is made that the statute which was considered in the *Burdick cases* is unconstitutional, or that this court, in the opinions filed by it, did not cor-rectly hold the law. Indeed, it is explicitly suggested by the petitioners that "the question raised by the peti-tion is not at all whether the statute in question is or is not valid and constitutional." The judgments of affirm-ance in the *Burdick cases* and the opinions of the court in deciding them are conclusive only as between the parties to those cases,—the People of the State and Burdick; but they are no estoppel as between the People of the State and the petitioners. Petitioners, therefore, are by ·

said judgments and opinions not deprived of the right to present to this court, or any other court, the question of the constitutionality and validity of the statute in question, and enforce their contention in that behalf by any argument that they or their counsel see fit, and demand the judgment of the court upon the claim they make.

The statute is either constitutional or unconstitutional. It having been enacted by the legislative power of the State, all the presumptions are and must be in favor of its constitutionality and validity. If it is unconstitutional, then petitioners, if occasion should require, are not precluded by the judgments and opinions in the *Burdick cases* from availing of such unconstitutionality. If it is a constitutional and valid statute, then the question of its propriety is one for the legislative department of the government, and not for us, and the court should not be hasty in permitting itself to be used by confessed violators of a criminal statute for the avowed purpose of enabling them to carry on a business that is prohibited by public law.

We are satisfied that the petitioners do not stand upon such ground as gives them the right to call upon the court to vacate, strike out and expunge the judgments and opinions in the *Burdick cases*. The petition, therefore, is dismissed out of court at the cost of the petitioners.

*Petition dismissed.*

Mr. JUSTICE CARTER, dissenting.

Mr. JUSTICE MAGRUDER, dissenting:

The imposition, shown by this record to have been practiced upon the Supreme Court of the State, was so outrageous in its character, that it is impossible for me to concur in the opinion of the majority. It seems to me that that opinion does not properly dispose of a very grave offense. It is the high office of this tribunal to administer justice between real parties and upon real issues, and, therefore, it ought, as it seems to me, to pro-

tect itself against fictitious and fraudulent suits. That the *Burdick case* was a fictitious proceeding will appear from a statement of the facts.

This is a petition filed in this court at the November term, 1894, by George M. McKenzie and five other persons to strike out, annul and expunge from the record and reports of this court the opinion and judgments in the two cases of *Burdick* v. *People,* 149 Ill. 600-611, for the alleged reason that the said causes were fictitious and collusive, and that the decisions therein were obtained by collusion and by fraud on the court. At the November term, 1894, we entered a rule upon George W. Hill and James H. Martin, attorneys for Burdick in said cases, upon William S. Forrest, M. Rosenthal, J. M. Herbert and Maurice T. Moloney, attorneys for the People therein, and upon William H. Green and George Burdick, to show cause by the May term, 1895, why the prayer of the petition should not be granted. The respondents, except Burdick, who could not be found, have filed their answers to the rule. Briefs have been filed by counsel in support of the petition, and also of the answers. Oral arguments also have been made upon the petition and answers and affidavits accompanying the same.

The case, made by the petition and the affidavits filed with it, is substantially as follows: At the May term, 1892, of the Criminal Court of Cook county indictments were returned into court against George M. McKenzie, Edward List and Edgar J. Hunter, three of the petitioners herein, and eight other ticket brokers doing business in Chicago, charging them with selling railroad tickets in violation of the act of April 19, 1875, "to prevent frauds upon travelers, and owner or owners of any railroad, steamboat or other conveyance for the transportation of passengers," commonly known as the "Anti-ticket broker act," and the constitutionality of which is passed upon in said case of *Burdick* v. *People,* 149 Ill. 600. Motions were made by the defendants to quash the indict-

ments. These motions came on for hearing at the October term, 1892, of said court. By permission of the State's attorney these motions were argued on behalf of the People by an attorney employed by the railroads, and notably by the Chicago, Milwaukee and St. Paul Railroad Company. The question discussed upon the motion to quash was the constitutionality of said act, the People contending for and the defendants against its validity. The judge, presiding in the Criminal Court at that time, gave it as his opinion, that the law was unconstitutional. The next morning the State's attorney, at the suggestion of the attorney representing the railroads, made a motion to enter a *nolle prosequi* in each of the causes, and this motion was granted.

At the November term, 1892, of said Criminal Court, six indictments were returned against two of the present petitioners and four other ticket brokers in Chicago, charging them with the same offense above specified. These indictments were upon the docket of said court at its March term, 1893, at which term another judge was presiding over the court. On March 23, 1893, the defendants entered motions for continuances. These motions were resisted by William S. Forrest, an attorney of Chicago and one of the respondents to the rule herein entered, who was employed by the railroad companies to conduct the prosecution of the cases. From this point the railroad company most active in the prosecution was the Illinois Central Railroad Company. The motions of the defendants for continuances were granted, and on March 23, 1893, the cases were continued to the April term, 1893, of said court. The 23d day of March, 1893, was Thursday.

On Monday, March 27, 1893, Forrest was in Cairo, Illinois, the home of the respondent, William H. Green, an attorney of the Illinois Central Railroad Company. On the 29th and 30th days of March, 1893, the two tickets numbered 5946 and 5947 introduced in evidence in the

*Burdick cases,* the price of each of which was $10.85, were issued at Cairo. On March 31, 1893, the man calling himself George Burdick, the plaintiff in error in the *Burdick cases,* went to Carbondale in Jackson county, on the Illinois Central railroad, and registered at the Newell House in that place, and remained in Carbondale during that day and during the next day, being April 1, 1893. On the latter day, April 1, 1893, which was Saturday, Green employed a detective in Cairo named Louis H. Myers to go to Carbondale, telling him that there was a young man there named Burdick engaged in the business of a ticket scalper; and Green and Myers went on that day on the same train to Carbondale. Myers went to the Newell House, and Green went to the Newell House. A description of Burdick was given to Myers by Green. Myers met Burdick at the Newell House on that day, and told him that he wanted to buy a ticket to Chicago and return, and then and there bought of Burdick said ticket numbered 5946, issued on March 29, 1893, and paid him $6.00 therefor. At the same time Burdick showed to Myers other railroad tickets and mileage books then in his possession. On that same day, Burdick sold the other ticket above mentioned to one Ashley, an employee of the Illinois Central Railroad Company, for the same amount. As soon as Myers had bought the ticket of Burdick, he reported the matter to Green. Thereupon the State's attorney, J. M. Herbert, made complaint before J. W. Grammer, a justice of the peace at Carbondale, Green being present at the time, and a warrant was at once issued for the arrest of Burdick. Ashley found a constable, named Batson, and took him to Green, who instructed him to arrest Burdick, and told him where and how Burdick could be found. Burdick was then arrested by the constable about four o'clock on the afternoon of said first day of April, 1893, and taken before Grammer, the justice. A few moments after the constable and Burdick arrived at the office of the justice,

Green came in. The justice asked Burdick if he had counsel, and, upon receiving a negative answer, suggested the names of several lawyers living in Carbondale, but Green suggested the names of Hill & Martin, respondents. herein, lawyers at Murphysboro, the county seat of Jackson county, and distant about eight miles from Carbondale. Burdick accepted the suggestion of Green as to the lawyers whom it was best for him to employ, and a telegram was at once sent to Hill & Martin at Murphysboro. In an hour or so Martin appeared in Carbondale, and, on that evening, the case came on for hearing before the justice. No proof was introduced; Burdick waived examination; by consent of Burdick, Martin, Herbert and Green, Burdick was bound over by the justice to the next term of the circuit court to be held at Murphysboro, Martin going upon the bond, or recognizance, entered into by Burdick to appear at said term. When Burdick was before the justice, he gave to the State's attorney the railroad tickets and mileage books in his possession other than those sold as aforesaid.

Burdick, if there was any such man, having been arrested and bound over as above stated on April 1, 1893, the scene shifts back to Chicago. On April 3, 1893, the six ticket brokers, under indictment there, began *habeas corpus* proceedings, two of them petitioning for writs of *habeas corpus* before one judge of the circuit court of Cook county, two before another judge, and two before still another judge of said court. The respondent in such petitions was James H. Gilbert, the sheriff of Cook county, who was represented by the respondent, Forrest. Returns were filed to the writs of *habeas corpus*, and the causes came on for hearing before said three judges sitting together on Saturday, April 8, 1893, just one week after the arrest of Burdick. Before the hearing began, motions were made by Forrest on behalf of the People to dismiss the petitions for *habeas corpus* and remand the prisoners, but these motions were overruled. The main

argument upon the petitions and the returns thereto con-
tinued during Saturday, April 8, 1893, and was concluded
on Monday, April 10, 1893.   The argument was resumed
at an early hour on the latter day, because of the state-
ment of Forrest that he desired to go out of the city
on business, without stating, however, what the business
was.   At the conclusion of the argument on April 10, the
causes were taken under advisement by the three judges
before whom they were heard, and their decision was
reserved until some future day, it being understood be-
tween the court and counsel on both sides, that written
statements of points and authorities should be filed with
each of said judges as soon as might be convenient.
These statements were thereafter submitted as arranged.
The main question involved in the discussion, which took
place on April 8 and 10, 1893, was the constitutionality
of said act of 1875; and, in the course of the argument,
some statement was made about the desirability of hav-
ing a decision by the Supreme Court of the State as to
the validity of said act.   It matters not in what form
the statement was made, or in what words it was ex-
pressed.   It is sufficient to say, that such disposition of
the pending causes, as would result in a presentation to
the Supreme Court of the question as to the constitution-
ality of said act, was favored by Forrest as attorney of
the People and of the railroads who were back of the
prosecution, and was opposed by the attorney of the in-
dicted prisoners petitioning for writs of *habeas corpus.*
Nothing, however, was said by Forrest, during the argu-
ments made on the 8th and 10th days of April, as to the
arrest of Burdick and binding him over to the next term
of the circuit court of Jackson county.

The scene again shifts to Murphysboro, county seat
of Jackson county, where the grand jury convened on
April 10, 1893.   Forrest appeared in Murphysboro on
Tuesday, April 11.   On the next day, Wednesday, April
12, the grand jury found and returned an indictment

against Burdick, and a motion was made to quash it. In the argument upon this motion Forrest assisted the State's attorney, J. M. Herbert. The motion was overruled, and on the next day, April 13, Burdick was tried and convicted for the offense of selling the tickets above named to Myers and Ashley. Herbert and Forrest appeared for the People, Green being also present, and Martin appeared for Burdick. A jury was waived, and the case was tried before the court without a jury. Myers, Ashley and Burdick were witnesses. The trial resulted in a judgment in each of the two cases, imposing a fine of $500.00 upon Burdick in each case. It was stated upon the trial, that the object of the proceeding was to make a test case, in order to present to the Supreme Court the question of the validity of said act. Burdick was never in custody under the indictments or judgments. He was allowed to remain at large upon the written stipulation of Hill & Martin, that they would save the State's attorney and sheriff harmless. Burdick was indifferent as to the result of the trial. To the sheriff, and the clerk, and three members of the bar who were present at the trial, the whole proceeding presented the appearance of a friendly and agreed case. The bill of exceptions was signed and sealed on the 14th day of April, 1893, the day after the trial and judgments.

The bill of exceptions thus signed on April 14, 1893, states, that the defendant asked the court to instruct the jury to find the defendant not guilty for the reason, that the said act was unconstitutional and void; that the court overruled said motion and defendant excepted; that the jury returned a verdict of guilty; that the defendant made a motion for a new trial; and that said motion was overruled. These statements were untrue. There was no jury, and hence no instruction was asked, and no verdict was returned.

In the written points and authorities, submitted to the three judges in Cook county, no mention was made by

Forrest of the trial of Burdick and of the rulings made by the judge of the circuit court of Jackson county, which resulted in the judgments against Burdick. On April 26, 1893, said judges decided the matter so taken under advisement by them, and held that the indictments set forth in the petitions did not charge offenses known to the law, and discharged the prisoners from custody.

The two cases against Burdick, so tried in Jackson county, were brought to this court by Hill & Martin, appearing as attorneys for Burdick, the plaintiff in error, at the May term, 1893, and were submitted and taken by this court at that term. The cases were not argued orally, but submitted upon printed briefs at Mount Vernon. Hill & Martin filed the record, abstracts and briefs for plaintiff in error with the clerk of the Southern Grand Division on May 1, 1893. The following endorsement was made upon the record by the State's attorney of Jackson county:

"STATE OF ILLINOIS, } *ss.*
   *Jackson County.* }

"I have examined this record, and in my opinion it presents a full and true history of the proceeding on trial.

JOHN M. HERBERT,
*State's Att'y of Jackson County.*"

And yet, this record, which the State's attorney says he examined, and as to which he gives it as his opinion, that it presents a true history of the proceeding on trial, falsely recited that there had been a trial before a jury, and an instruction asked, and a verdict rendered. The falsity of the recital thus made in the record must have been known to the State's attorney, because he was present at the trial.

The abstract of the record so filed by Hill & Martin, and prepared by them, contains the following recital, which Martin knew to be false because he was present at the trial: "A jury is empaneled; the evidence heard; the cause argued and the jury returns a verdict of guilty. The defendant enters a motion for a new trial, which

the court overrules and the defendant excepts. The defendant enters a motion in arrest of judgment which the court overrules, to which defendant excepts." In the original brief, filed by Hill & Martin in this court, is the following statement: "A motion was made to instruct the jury to find the defendant not guilty, for the reason that the act, under which the prosecution was instituted, was void, which was overruled. A motion was made in arrest of judgment which was also overruled. We think they should each and all have been sustained." In the reply brief filed by them on May 13, 1893, they say: "The motion to quash and the *instruction asked* is limited to this question." In the brief filed in this court on May 10, 1893, signed by "Maurice T. Moloney, Attorney General; J. M. Herbert, State's attorney, Jackson county; W. S. Forrest, M. Rosenthal, of counsel," the following statement is made: "The record shows that the *only instruction asked* was that the act of the legislature, upon which the indictments are based, was in conflict with the constitution, and that, for that reason, *the jury should find the defendant not guilty.*"

The returns or answers, filed by respondents herein to the rule entered upon them, are not satisfactory. They are too general in their terms. They deny that there was collusion, but they do not explain the circumstances, which point unerringly to the conclusion, that these *Burdick cases* só-called were collusive cases. The answers will be referred to more particularly hereafter.

*First*—The first and most noticeable feature about these cases is the false record which was presented to this court. It is not denied by the respondents, but on the contrary it is conceded by them, that there was no jury trial in the case. And yet there was submitted to this tribunal a record, which stated that a jury was empaneled, that an instruction to the jury was asked and refused, that a verdict of guilty was returned, that a motion for a new trial was entered and overruled, and that,

among the reasons assigned why a new trial should be granted, were the following: "First, court refused proper instruction asked by defendant; second, verdict is against the law; third, the verdict is against the evidence." The attorneys both for the plaintiff in error and for the defendant in error argued the case here upon the theory, that the court below erred in refusing to give an instruction, which was never asked, to a jury, which never had an existence. Those of the respondents here, who were present at the trial below, knew that these statements in the record were false. What is the explanation given of the matter in the returns to the rule? Hill & Martin say: "The record of the cases was made up by the clerk of the circuit court of Jackson county, and is a true transcript of the record made by the court." Forrest says: "That Burdick waived a jury trial; that, when he waived a jury trial, the presiding judge, as this respondent remembers, among other things said, in relation to what some of the counsel said, that in accordance with his practice, he would permit the record to show that Burdick was tried by a jury." Herbert says: "Burdick  *  *  * was tried, so far as affiant is informed, according to the forms and spirit of the criminal law, except without a jury, that having been waived by defendant." If counsel by agreement waived a jury and submitted the cause for trial to the court without a jury, the record should have shown that fact. The statutes of this State contain provisions for trials before the court without a jury, which are distinct from those in relation to trials before a jury. In the former case, the rulings upon questions of law are preserved by means of written propositions submitted to the court to be held as law and to be marked "held" or "refused," while, in the latter case, the propositions of law are embodied in instructions given or refused. The waiver of a jury does not justify the making of a false record showing a jury trial. The statements, made by the respondents in their answers as above quoted

upon this subject, do not satisfactorily explain the false record, and are of such a character as to require further and more thorough investigation into the fictitious and fraudulent character of these cases. The harmony, with which both parties have united in treating the false record as a true record, is one of the strongest circumstances, tending to show collusion and intended imposition upon the Supreme Court of the State.

*Second*—The second noticeable feature herein is the circumstance, that a controversy was manufactured, and made to look as though it was real, for the purpose of bringing before the Supreme Court of the State the question of the validity of an act of the legislature. Who was the man, Burdick, who was indicted in Jackson county? Why did he go to Carbondale on March 31, 1893? Green says: "I was informed by the Illinois Central Railroad Company, that I would find a man named George Burdick selling railroad tickets in Carbondale in violation of the law, and was requested by said company to have him prosecuted." The Illinois Central Railroad Company is a corporate entity. It can not speak except through the mouths of men who represent it. Who furnished the information that Burdick was selling tickets in Carbondale? Who made the request for his prosecution? Did the information and the request come to Green as the result of Forrest's visit to Cairo on March 27, 1893? Two tickets, used in evidence on the trial of the *Burdick case*, were issued by the Illinois Central Railroad Company at Cairo on March 29 and 30, 1893. Were they so issued as the result of Forrest's visit to Cairo on March 27? Who issued them, and to whom were they issued? The price of each of them was $10.85, and Burdick sold each of them for $6.00 at Carbondale on April 1, 1893. It is not to be supposed, that he bought them himself for $21.70, and sold them a day or two afterwards for $12.00. How did they get from Cairo into Burdick's possession at Carbondale so soon

after they were issued? They were in his possession certainly on April 1, and must have been in his possession on March 31. Before Green left Cairo with the detective, Myers, he knew that Burdick was at Carbondale, and that he would try to sell tickets there. Burdick had never been seen at Carbondale before March 31, 1893, and has never been seen there since April 1, 1893, unless, perhaps, he passed through on his way to Murphysboro to be present at the trial on April 12 and 13. Diligent search has since been made for him, and he can nowhere be found. He could not be found by the sheriff, and has not been served with notice of the rule to answer in this case. While it is claimed, that a man was arrested for selling the tickets at Carbondale, it is not seriously contended, that a man having the real name of Burdick was so arrested. Green says, that, as soon as he arrived in Carbondale on April 1, 1893, he went to the telegraph office connected with the depot of the Illinois Central Railroad Company, "and there received a personal description of Burdick." Who gave him the description? Was it given there, or communicated by telegram from some other point? Burdick was in Carbondale two days, and had no business there except to sell the two tickets above described.

As this matter now stands upon the petition herein filed and affidavits accompanying the same, and upon the returns made and affidavits accompanying them, the conclusion, to any man of common sense, is almost irresistible, that Burdick was sent to Carbondale for the purpose of going through the form of making sham sales of railroad tickets, and of submitting to arrest for such apparent offense. He made no sales there except of the two tickets already referred to; and one of these he sold to Myers, a detective employed by the Illinois Central Railroad Company and taken to Carbondale by the attorney of that road; and the other he sold to Ashley, an employee of said railroad company and son of its agent

at Carbondale. It is a singular fact, that young Ashley has disappeared, having enlisted as a private soldier in the United States army. All of Burdick's movements indicate, that he was acting under unseen influences, which were in perfect harmony with those purchasing the tickets of him and securing his arrest. It is not claimed, that the ticket brokers indicted in Chicago, or the association of which they were members, were responsible for the conduct of Burdick. It is conceded, that the railroads were pressing and assisting the prosecution, and it is shown, that the offense consisted of selling tickets to the employees of one of these very railroads. In other words, the railroads were aiding the State in prosecuting an offense, which they themselves induced the prisoner to perpetrate.

The petitioners produce affidavits showing, that, when Burdick was before the justice of the peace after his arrest, Green suggested to him, that he should employ Hill & Martin of Murphysboro to defend him; and he did employ them, although the names of other lawyers of ability in Carbondale were suggested to him by the justice. It is certainly a very unusual circumstance, that a prisoner charged with crime should select, as his defenders, lawyers who are recommended by the man procuring his arrest. Green's explanation of this circumstance is not satisfactory. He admits that he said, at the justice's office, when others were recommending attorneys: "And Hill & Martin are the best lawyers at the county seat;" he says, that his remark was not addressed to Burdick and was only made as a part of a running conversation. It is, nevertheless, true that Burdick heard it, and accepted the suggestion contained in it by sending for Hill & Martin.

Who paid the fees of Hill & Martin, and the fines, amounting to $1000.00, imposed upon Burdick by the judgments of the circuit court? It is hardly credible, that this stranger who can nowhere be found, who has

no permanent place of abode, who was seen for a few days at Carbondale and Murphysboro in April, 1893, and then disappeared, was able himself to pay the expenses of the litigation. Hill & Martin say, that Burdick paid them a retainer on April 1, 1893, and paid them money from time to time while the cases were pending in the circuit and Supreme Courts, and that, when the decision of this court was rendered, they notified Burdick of it, and received a reply from him, that he would come to Murphysboro in a few days, and settle the fines and fees. Where was he when they so notified him? They do not explain. He did not come as he promised, but they say: "A few days afterwards a man, who introduced himself as Allen, came, and said he was sent by Mr. Burdick to pay off his fines and our fees. He called on State's attorney, Mr. John M. Herbert, and they went to the court house together. The fines and costs were paid by him and the judgments satisfied." Who was Allen? The sheriff of Jackson county swears, "that State's attorney Herbert told affiant that the fine of $500.00 in each of said cases has been paid to him,   *   *   *   · and that he applied the same to his own use, and (on) account of moneys due him from the county on conviction." The clerk of the circuit court of Jackson county swears, "that this affiant as such clerk   *   *   *   never received either of the fines imposed in said causes,   *   *   *   nor any part thereof." Herbert says in his answer: "After affirmation of judgment by the Supreme Court, a man introduced to me by the name of Allen from Chicago, Ill., called on me, and, on behalf of Burdick whom he said he represented, paid to me the sum of $1075.00, being in full of two fines of $500.00 each, which had been imposed by the circuit court, together with attorney's fees in both cases in the circuit and Supreme Courts. This amount has and was, on the day received, properly receipted for on the judgment docket of the circuit clerk of this county,

and included in sworn report of mine at their regular term of the circuit court following."

The detective, Myers, says that all his expenses in going from Cairo to Carbondale, and while there, and "in and about the matters and things" there attended to by him, were paid to him by the Illinois Central Railroad Company, and that "the money he had paid to said Burdick for the ticket" was afterwards paid to him by said company.

*Third*—The third noticeable circumstance here presented to view is the deception, which was practiced upon the parties interested in the question of the validity of the act hereinbefore referred to. The real offenders and violators of the law were the indicted ticket brokers in Chicago. They were the parties who had an interest in presenting all that could be said against the validity of the act to this court. If they had had a chance to be heard, the argument against the act may have been a much more forcible one than the one addressed to the court in the *Burdick cases.* But, manifestly, Forrest made use of the proceeding in Cook county as a blind to conceal the proceedings in Jackson county. By the prosecution in Cook county the real criminals were thrown off their guard, while a mere figure-head was arrested and placed on trial in Jackson county with no special motive to make a vigorous presentation of his side of the case. The success, with which a fictitious cause was rushed through 'a circuit court in a remote part of the State, while the main contest was supposed by the uninitiated to be going on in the city of Chicago, strikes the lover of justice and fair play with amazement. It is not to be tolerated, that the machinery of the *nisi prius* courts should be made use of in this unscrupulous fashion for the purpose of imposing unreal controversies upon the court of last resort. Forrest's answer does not satisfactorily explain his conduct. He makes no denial of his visit to Cairo on March 27, 1893, and avoids all mention

of it, or of its purpose. It is not material, that Burdick was arrested and bound over before the petitions for *habeas corpus* were filed. The material consideration is that, while the indictments against the ticket brokers were pending, and three or four days after their continuance on March 23, 1893, Forrest appeared in Cairo, and immediately thereafter there occurred the series of events which culminated in the arrest and trial of Burdick. It may be true, that it was desirable to have a determination of the constitutionality of the act of 1875, and that the difficulties connected with the enforcement of the act in Cook county were very great. But the manufacture of a fictitious prosecution is not, on these accounts, an excusable act.

What is the duty of this court in the premises? In *People ex rel.* v. *Beattie*, 137 Ill. 553, we said, that the vocation of the lawyer is to correctly inform the court upon the law and the facts of the case, and to aid it in doing justice and arriving at correct conclusions; and that he violates his oath of office when he resorts to deception, or permits his clients to do so. This is not only true, as applied to the lawyer who travels along the lowly walks of the profession, but it is equally applicable to the lawyer, who has behind him the wealth and power and influence of the great corporations.

In *Earl of Brandon* v. *Becker*, 3 Clark & Fin. 479, in an opinion delivered by Lord BROUGHAM, it was said: "A sentence is a judicial determination of a cause agitated between real parties upon which a real interest has been settled. In order to make a sentence there must be a real interest, a real argument, a real prosecution, a real defense, a real decision. Of all these requisites not one is present in the case of a fraudulent and collusive suit; there is no judge, but a person invested with the insignia of a judicial office is misemployed in listening to a fictitious cause proposed to him; there is no party litigating,

there is no party defendant, no real interest brought into question."

In *United States* v. *Flint*, 4 Sawyer, 52, Mr. Justice FIELD says: "So, if the litigation be collusive, if the parties be fictitious, if real parties affected are falsely stated to be before the court, the judgment recovered may be set aside or its enforcement restrained, for in all these cases there would be the want of the actual litigation, which is essential to a valid judicial determination. To every such case the words of the jurist would be applicable : *Fabula, non judicium, hoc est; in scena, non in foro, res agitur.*"

It is a contempt of court to bring or take fictitious actions or proceedings. (Oswald's Cont. of Court, p. 68). In *Smith* v. *Brown*, 3 Tex. 360, where the object of the parties to the suit was to obtain a judicial decision on the constitutionality of an act of the legislature, it was said: "The suit is not founded on a *bona fide* transaction. * * * Every fictitious case is a contempt of the court, and when known to be such, has subjected the parties to the severe animadversion of the court; such as fine and imprisonment."

In *Gaines* v. *Hennen*, 24 U. S. 615, Mr. Justice WAYNE said: "That was a false and fictitious case. * * * The object of that suit was to circumvent this court by a fraudulent contrivance to obtain an opinion here, * * * and for us now to declare that so gross a contempt to this court, and the practice of a fraud so disgraceful to the administration of justice, established any matter of fact or any binding principle of law, would be to sanction and uphold that proceeding, and to invite its repetition."

Where there is collusion between the parties, a stranger may lay it before the court as *amicus curiæ.* (*Cox* v. *Phillips*, Hardw. (Cases *temp.* Lee,) 237 ; *Lord* v. *Veazie*, 8 How. 251).

The question here is not, whether the decision of this court in holding the act to be constitutional is correct or

not. The question is, whether these respondents, or any person or persons or railroad or railroads standing be-. hind any of these respondents, have been guilty of a contempt of this court. It is true, that the petitioners, in their petition, pray only that the judgments and opinions be expunged, and ask for no punishment to be inflicted as for a contempt. Their sole object is to get rid of the force and effect of a precedent, which may be in their way in the matter of plying their business as ticket brokers. But this court has the power, and it is its duty, *of its own motion,* to call those to account who trifle with its dignity, and fraudulently impose upon it the task of deciding fictitious causes.

It is said, that the returns or answers made by the respondents are sworn to; and that the matters and things, involved in the issue made upon the petition and the answers thereto, were submitted for argument without the filing of replications; and that, therefore, the denials in the answers must be assumed to be true. In reply to this, it may be said, in the first place, that the denials are merely general in terms, and lose their force by failing to account for the specific acts and circumstances tending to show collusion; and, in the second place, that, whatever may be the technical rule in ordinary cases as to the effect of submitting a cause for hearing upon petition or bill and answer, such rule can have no application here. Where the question is, whether the machinery of the courts has been so used by means of a fraudulent collusion between parties, as to injure the cause of justice and bring disgrace upon its administration, no mere technicality should stand in the way of a searching investigation.

It is also said, that these petitioners are scalpers and criminals, and that they are entitled to no consideration from this court, when they apply for the expunging of a decision which prevents their continued violation of a statute of the State. All that it is necessary to say, in

reply to this, is, that the meanest criminal at the bar of justice is entitled to be heard before he is condemned, and to be represented before the courts by counsel of his own selection. In view of the circumstances already detailed, the real criminals here have not been properly heard, nor properly represented, in prosecutions vitally affecting their interests.

It is furthermore contended, that these respondents should not be condemned upon mere *ex parte* affidavits. This contention has great force. The issue here is so serious, that it ought not to be disposed of without an opportunity for a thorough investigation by the examination and cross-examination of witnesses. All the observations herein are based upon the case made by the petition and answers and the affidavits accompanying them respectively. It may be, that a different view of the subject would be presented if the parties here making affidavits were examined and cross-examined as witnesses. Ordinarily, when this court desires to be informed upon a question of fact arising in an original proceeding, it sends the issue to some circuit court in the State to be tried before a jury. Manifestly, however, no jury can be allowed to determine for this court whether it has been imposed upon by the filing of a false record, or the presentation of a collusive case. That is an issue which this tribunal must decide for itself. The proper course to pursue is to appoint a commission, or commissioner, to take the testimony upon the subject, with liberty to the petitioners and respondents respectively to examine and cross-examine the witnesses, so that the whole matter can be thoroughly investigated. This seems to have been the course pursued by the Supreme Court of the United States in *American Wood Paper Co.* v. *Heft*, 131 U. S. 92. (See, also, *Bartemeyer* v. *Iowa*, 18 Wall. 129). ·

Mr. JUSTICE PHILLIPS: I concur in the dissenting opinion of Mr. Justice MAGRUDER.