## THOMAS *et al. v.* WABASH, ST. L. & P. RY. CO. *et al.*

*(Circuit Court, S. D. Illinois. October 15, 1889.)*

**1. CONSTITUTIONAL LAW—ILLINOIS WATER-CRAFT ACT—TITLES OF LAWS.**
Act Ill. May 24, 1877, entitled "An act to facilitate the carriage and transfer of passengers and property by railroad companies," authorized all railroad companies having a terminus on any navigable river bordering on the state to own for their own use any water-craft necessary in carrying across such river any property or passengers transferred on their lines, and provided "that no right shall exist under this act to condemn any real estate for a landing for such water-craft, or for any other purpose," and that the act should apply only to "such railroad companies as own the landing for such water-craft." *Held,* that the title was misleading, and not sufficiently broad to include the proviso, under the constitutional provision (article 4, § 13) that no act should embrace more than one subject, which should be expressed in the title.

**2. SAME—SPECIAL LAWS.**
Under the general incorporation act of Illinois all railroad corporations whose lines terminated on bordering navigable streams had power to condemn lands at their terminus in order to reach ferries. *Held,* that the proviso in the act of 1877, limiting the right to own and use boats to carry freight and passengers to "such railroad companies as own the landing for such water-craft," was within the prohibition of Const. Ill. art. 4, § 22, forbidding the passage of special laws for granting special or exclusive privileges to any corporation, and could not be upheld on the ground that it classified railroad companies whose roads terminated on bordering rivers into such as then owned a landing place and such as did not.

At Law. Condemnation proceedings.

Intervening petition by the St. Louis & Cairo Railroad Company and the Mobile & Ohio Railroad Company for the condemnation of certain lands, for an incline, and transfer-boat landing.

*E. L. Russell, H. S. Greene,* and *Lansden & Leek,* for petitioners.

*John M. Butler* and *S. P. Wheeler*, for receivers.

ALLEN, J. This case has been before the court, in one form and another, for nearly two years. The intervening petitioners instituted proceedings in the circuit court of Alexander county, Ill., to condemn one acre and a fraction of land, situated between the bank of the Ohio river and the water for the purpose of building thereon an incline, to be used for the transportation of cars down to the river, and thus, by means of transfer-boats, form an unbroken connection with railroads on the other side, for the benefit of their through freight and passengers. The strip of land sought to be condemned, being in the possession of Thomas & Tracy, receivers, appointed by the court, of the Cairo & Vincennes Railroad, and claimed by them as the property of that corporation, the case was transferred to this court, and afterwards a hearing was had before the district judge and a jury, resulting in a holding by the court[1] that the strip of land was subject to condemnation for the purposes set forth in the intervening petition, and the assessment by the jury of damages, to be paid by the St. Louis & Cairo and the Mobile & Ohio Railroad Companies, in the sum of $5,000. Subsequently, upon argument before the circuit and district judges, a rehearing was granted in the case, upon the distinct ground that the act of the Illinois legislature, entitled "An act to facilitate the carriage and transfer of passengers and property by railroad companies," approved May 24, 1877, presented an insuperable barrier to such condemnation. 34 Fed. Rep. 774. Afterwards, upon further argument, the matter was postponed, pending the suggestion of the court that the receivers sell to the intervening petitioners for a fair price, to be agreed upon, so much of the ground as might be necessary for the purposes of their incline. The St. Louis & Cairo and their lessees, the Mobile & Ohio Railroad Company, having, as they report, wholly failed, after repeated efforts, to purchase from the receivers the land for their incline, asked that the constitutionality of the act of the legislature before referred to, and popularly known as the "Water-Craft Act," be set down for argument. There being no serious contention that any other difficulty to the condemnation than this water-craft act existed, and its constitutionality being challenged by attorneys for intervening petitioners, the court set down the question for argument, and it was ably and elaborately argued, by eminent counsel, representing the receivers, as well as the St. Louis & Cairo Railroad Company and its lessees, the Mobile & Ohio, before the district judge. So much of the act in question as is here necessary to be considered is as follows:

"An act to facilitate the carriage and transfer of passengers and property by railroad companies.

"Section 1. Be it enacted by the people of the state of Illinois, represented in the general assembly, that all railroad companies incorporated under the laws of this state, having a terminus upon any navigable river bordering on this state, shall have power to own for their own use any water-craft neces-

[1]Not reported.

sary in carrying across such river any cars, property, or passengers transported over their lines. or transported over any railroad terminating on the opposite side of such river to be transported over their lines: provided, that no right shall exist under this act to condemn any real estate for landing for such water-craft, or for any other purpose. And this act shall only apply to such railroad companies as own the landing for such water-craft."

The validity of this act is denied, and the counsel questioning its constitutionality contend—*First*, that it is in conflict with the thirteenth section of the fourth article of the constitution of Illinois, which is in the following language:

"Every bill shall be read at large on three different days in each house; and the bill and all amendments thereto shall be printed before the vote is taken on its final passage, and every bill having passed both houses shall be signed by the speakers thereof. No act hereafter passed shall embrace more than one subject, and that shall be expressed in the title. But if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be so expressed; and no law shall be revived or amended by reference to its title only, but the law revived or the section amended shall be inserted at length in the new act."

And, *second*, that it is in conflict with section 22 of the same article, which provides:

"The general assembly shall not pass local or special laws in any of the following enumerated cases, that is to say, * * * for granting to any corporation, association, or individual any special or exclusive privilege, immunity, or franchise whatever."

*Third*, that it is in conflict with article 11, § 14, of the state constitution of 1870, which reads as follows:

"The exercise of the power and the right of eminent domain shall never be so construed or abridged as to prevent the taking by the general assembly of the property and franchises of incorporated companies already organized, and subjecting them to the public necessity, the same as of individuals."

In addition to these objections, it is contended that the act is also repugnant to the spirit and import of the state and federal constitutions, intended to secure equality of rights to every citizen, natural and corporate. Grave and important constitutional questions are thus brought before the court, and its decision upon them demanded.

It is with extreme unwillingness that a federal court will assume to hold as void the acts of the legislature of a state, especially when such acts have not been passed upon by the state court. And if any well-grounded doubt exists as to their constitutionality, whenever by any system of fair reasoning any possible construction that is consistent with reason can be given by which the courts can hold them constitutional, and give such interpretation to the statutes as to make them valid, they will always do so. But courts, however unpleasant the duty, will always, when properly called upon, considerately review the acts of a co-ordinate branch, and, while hesitating to hold them void for unconstitutionality, yet, when they find them in bold defiance of the constitution, seeking to override some valuable right or privilege of the citizen

o⸗ of the public, will not shrink from the performance of the high duty imposed upon them by the law.

The first objection argued to the validity of a portion of the water-craft act, namely, that it embraced subjects not expressed in the title, must be tested and disposed of by the decisions and their analogies of the supreme court of Illinois; this thirteenth section of the fourth article of the state constitution having repeatedly been before that tribunal for exposition and interpretation. The object of the constitutional provision was praiseworthy. Its evident purpose was to prevent fraudulent and vicious legislation, by requiring the title to give a fair indication of the substance of the act,—such a certain indication as would notify members of the legislature, the public at large, and more particularly all persons having an interest in the matter, of the contents of the act, so as to put them on their guard. Whenever the title of the act has a scope so clear as to indicate its general purpose, then its more specific purposes may be left to the body of the act itself. The title of this act is: "To facilitate the carriage and transfer of passengers and property by railroad companies." This title, it must be confessed, is at once captivating and delusive. The entire public would most likely unite, and the desire become a common one, to facilitate the carriage and transfer of passengers and property by railroad companies, but not the slightest intimation is given as to the means to be employed whereby this transfer is to be facilitated. Indeed, it would seem difficult, by any combination of words, to make a title to any act more general. The body of the act authorizes all railroad companies, having a terminus upon any navigable river bordering on the state of Illinois, to own for their own use any water-craft necessary in carrying across such river any cars, property, or passengers transported over their lines, or transported over any railroad terminating on the opposite side of such river, to be transported over their lines, with a proviso that no right shall exist under the act to condemn any real estate for a landing for such water-craft, or for any other purpose, and that the act itself shall only apply to such railroad companies as own the landing for such water-craft. It is assumed, that this act confers a new power on railroad companies,—that of using and owning water-craft to transfer freight and passengers across the river; and it may be assumed that it also takes away from certain railroad corporations rights with which they had become vested under the general incorporation law of the state, particularly the power to make such terminal enlargements, and variations of their terminal privileges, not constituting a new enterprise, as the commerce of the country and the traffic of their roads require. It cannot be well questioned that railroads, whose lines terminated on the bank of one of the navigable rivers bordering on this state, where their business required it, had the power, prior to the water-craft act of 1877, to extend their tracks, or build side tracks, to the edge of the water, and condemn land subject to condemnation for that purpose. Under this act railroad companies cannot condemn land at all, however necessary it may be, to reach the water. After such examination and reflection as I have been enabled to bestow on the question, I am una-

ble to reach the conclusion that the title of this act fairly or sufficiently gives notice or information of the scope and substance in the body, or indicates with reasonable certainty the purposes intended to be effected; but, on the contrary, I am clearly of opinion that the title is misleading, and not as broad as the act. This view is supported by the following authorities: *People* v. *Mellen*, 32 Ill. 182; *Lockport* v. *Gaylord*, 61 Ill. 276; *People* v. *Wright*, 70 Ill. 388; *People* v. *Deaconesses*, 71 Ill. 229; *Middleport* v. *Insurance Co.*, 82 Ill. 565; *People* v. *Hazelwood*, 116 Ill. 327, 6 N. E. Rep. 480; *Leach* v. *People*, 122 Ill. 421, 12 N. E. Rep. 726; *Dolese* v. *Pierce*, 124 Ill. 140, 16 N. E. Rep. 218; Cooley, Const. Lim. 147–151.

The second point argued in connection with the alleged invalidity of the legislative act presents a most important question: Does the watercraft act grant, and was it intended to grant, any special or exclusive privilege, immunity, or franchise whatever to any corporation? If it does, it is special legislation, prohibited by the constitution. The fundamental idea of the authors of the constitution, expressed in a declaration clear and explicit, was doubtless to secure some reasonable degree of equality and uniformity of right and privilege between the different railroads in the state, which are required to perform important services to the public. In the first part of the act under consideration no principle of uniformity of right or privilege is violated. All railroad companies incorporated under the laws of the state, having a terminus on any of the navigable rivers on its borders, are given power to own for their own use water-craft necessary in carrying across such river cars, property, or passengers transported over their lines, or transported over any railroad terminating on the opposite side of such river, to be transported over their lines. It has already been mentioned that the concession seems to have been made, on the argument, of the grant of a new power to the class of Illinois railroads terminating on bordering navigable waters. Up to the approval of the act in question, these railroads, by the general incorporation act, with the view of merely enlarging their terminal facilities, had the undoubted right of going to the water,—to transports or ferry-boats. It was because they did not possess the power to own and use such transports or ferry-boats back and forward between terminal points on opposite sides of these rivers that the legislature was appealed to, and the new power given. The legislature, in answering this appeal, did a wise thing, in the first clause of the act, by granting to these railroad corporations the privilege of ferrying,—carrying goods and passengers through, on through cars, putting them on boats and transferring them across the river, and expediting railroad business and accommodating the public by simplifying the number of intervening agencies. The act, however, seems to have gone much further than the interests of commerce or of the public demanded. The parties seeking this legislative aid,—a ferry franchise,—in addition to a railroad franchise, were not satisfied with a general grant of power to all railroads having the same terminus, but sought to accomplish the double purpose of getting this new power for themselves, and keeping everybody

else from getting it, as far as they could. By providing that no railroad company should be given power to condemn land for a landing for such water-craft, and that the act should only apply to such companies as own the landing for such water-craft, the objectionable and vicious features of this legislation clearly appear. The new power enabled railroad companies owning land for a landing to own and use water-craft necessary in ferrying passengers and property across a river, but disabled companies not owning such land from exercising this most important franchise or privilege. I have had occasion before to state that, under the general incorporation act, railroad corporations, whose lines terminated on a bordering navigable stream, had the power to go to ferries, when they did so by merely enlarging their terminal facilities; but the portion of the act now being considered takes away an existing power, by declaring that they shall not exercise the power of eminent domain to the extent of getting down to a ferry-boat; that they can neither use a transfer-boat nor get to a landing. The additional power, or enlarged franchise, to own and use boats to carry freight and passengers across the river is limited "to such railroad companies as own the landing for such water-craft." Corporations not fortunate enough to own the land, it may be, in consequence of a refusal by rival corporations to sell what they do not need for their own purposes, are denied alike the privilege of owning water-craft and of condemning land to reach a ferry-boat which may be used or owned by others. It cannot be denied that the operation of this part of the act is partial and unequal.

Here are two railroad companies,—the Cairo & Vincennes, represented by the receivers, Thomas & Tracy, and the St. Louis & Cairo, by intervening petitioners,—both terminating on the bank of the Ohio river at Cairo. They owe a common duty to the public, and this duty grows correspondingly with the demands of commerce, and public necessity and convenience. The Cairo & Vincennes answers the demand of the public for boats transferring across the river cars, freight, and passengers connecting on the opposite side with other railroad lines, and thus securing unbroken transportation. The St. Louis & Cairo, when called on for a similar service, is unable to respond. It avows its willingness to do so, and its anxiety to discharge its duty to the public, but it does not own the land for a landing for transfer-boats. The owner of this land, the Cairo & Vincennes, will not sell it, and this water-craft act prohibits its condemnation. Is it not perfectly manifest that the Cairo & Vincennes, under this act, enjoys a special privilege or immunity over the St. Louis & Cairo? Or, to put it differently, are not all the railroads not owning land for a landing, and unable to purchase the same, discriminated against, and a special privilege granted to such, and such only, as own the landing? If in this controversy only these two railroad companies were interested,—if it were a contest of mere private right between them,—different considerations might arise. But they are both "railroad companies, incorporated under the laws of this state," enjoying franchises to be used in the interests of the public. The one owning the landing would in all probability promise the public to serve it efficiently, faith-

fully, and cheaply; but the public, unwilling to accept such assurances, very properly demand that all the avenues for the transaction of the commerce of the country be kept open, and that no agency be crippled which has for its object the promotion of the public interests.

In the discussion of this question, counsel for the receivers emphasized the argument that the legislative act could be upheld upon the ground that railroad companies terminating on a river bordering on a state, and owning a landing for water-craft, constitute a class; that the legislature intended to classify railroads terminating on navigable bordering streams into such as owned land for a landing for water-craft and such as did not, and that a railroad corporation not owning a landing for water-craft can only claim such privilege, immunity, or franchise as belongs to any other company or corporation in that class. A number of authorities were cited to sustain this view; among others, *Railroad Co.* v. *Iowa,* 94 U. S. 155. This position cannot be sustained, nor do the authorities referred to support it. There is but one classification of railroad companies under the act, and that is such as have "a terminus upon any navigable river bordering on this state." The supreme court, in 94 U. S., *supra,* quote approvingly, an Iowa case being under consideration, from *McAunich* v. *Railroad Co.,* 20 Iowa, 343, wherein it is said:

"These laws are general and uniform, not because they operate upon every person in the state, for they do not, but because every person, who is brought within the relations and circumstances provided for, is affected by the law. They are general and uniform in their operation upon all persons in the like situation, and the fact of their being general and uniform is not affected by the number of persons within the scope of their operation." "The statute," (of Iowa,) says Chief Justice WAITE, "divides the railroads of the state into classes, according to business, and establishes a maximum of rates for each of the classes. It operates uniformly on each class, and this is all the constitution requires."

It seems probable that the authors of the act under consideration prepared it with reference to this doctrine of classification. But it gives them no support. Every privilege, immunity, or franchise enjoyed or used by one railroad company terminating on the Ohio river at Cairo should be extended to every other railroad terminating there. It is impossible, by any fair reasoning, or upon any principle of justice to the public, to sustain the contention that one of these railroad corporations loses an almost invaluable privilege of serving the public because only of not being able to purchase land for a transfer or ferry landing. All the incorporated railroad companies terminating at Cairo exercise their franchises by virtue of grants from the sovereign power. The state, in granting the charters, necessarily in every instance reserved the right to regulate and control the corporations in the public interest. No one or more of these companies can be permitted, under the semblance of a state grant or authority, to exercise rights and privileges in connection with facilitating the commerce of the country which are denied to others. And if the exercise of such power and authority by the one or more is rightful, the denial of the same immunities and privileges to others is

illegal and oppressive; and any act pretending to confer authority for such discrimination is void. The water-craft act, therefore, has not only a false and deceitful title, but its purpose was to confer special privileges upon certain corporations, and to deny to others of the same class the exercise of the same rights. The following authorities are referred to in support of this view, that the act is in conflict with the twenty-second section of the fourth article of the constitution of Illinois: *Frye* v. *Partridge*, 82 Ill. 273; *People* v. *Cooper*, 83 Ill. 586; *People* v. *Meech*, 101 Ill. 200; *Millett* v. *People*, 117 Ill. 305, 7 N. E. Rep. 631; Cooley, Const. Lim. 389–396.

The views already expressed and the conclusions reached render it unnecessary to consider the fourteenth section of article 11 of the constitution of 1870, or the second section of the fourth article of the constitution of the United States, both of which have been referred to as authority against the validity of the act in question. They were cited to sustain the position that a statute is unconstitutional which selects particular persons, natural or corporate, from a class or locality, and subjects them to peculiar rules, or imposes upon them special obligations or burdens, from which others in the same locality or class are exempt. This position is so nearly self-evident as not to require authority to support it. In my view, the provisions of the water-craft act, limiting the right to own and use boats and water-craft to such railroad companies as own the real estate for a landing, and withholding the right from companies not owning the land for a landing, are obnoxious to both objections urged against its constitutionality, and cannot be upheld as valid or binding. Of course this conclusion in no manner affects provisions of the act which are constitutional. The constitutional and unconstitutional provisions of this act are perfectly distinct and separable, so that the first may stand, though the latter fall. The salutary and useful provision permitting all Illinois railroad companies terminating on any navigable river bordering on the state to own and use water-craft as a means of increasing their capacity to serve the public is unexceptionable; but the proviso restricting the use of this additional franchise to companies owning land for a landing is void.