(*In the Circuit Court of Cook County.*)

## People of the State of Illinois ex rel.

### vs.

## James Pease, Sheriff.

(October 26, 1898.)

1. MAXIMS. Under the maxim *"Salus populi, suprema lex"* the state may in the exercise of police powers deprive the citizen of his property without compensation or legal procedure.
2. POLICE POWER—EXTENT OF. Under the mere guise of police regulation personal rights and private property cannot be arbitrarily invaded and the determination of the legislature is not final or conclusive.
3. CONSTITUTIONAL LAW—VALIDITY OF LAW PREVENTING RESALE OF RAILROAD TICKETS. The Illinois act of April 19, 1875, making it unlawful for any person not possessed of authority from railroad companies to sell, barter or transfer railroad tickets, is not a valid exercise of the police power, inasmuch as it does not affect the public health, morals or public welfare.

5

4. PUBLIC USE—REGULATION OF SALES OF TICKETS BY PUBLIC CORPORATIONS. It is an exercise of the right to control quasi-public corporations for a legislature to impose lawful conditions upon the original sale of a ticket by a transportation company to a purchaser, but once a ticket has been issued entitling a holder to ride and therefore transferable by delivery, any legislation in reference to the future disposal thereof is not an exercise of the power to regulate and control corporations impressed with a public duty but a bold and unwarranted interference with the property rights of citizens.

5. TITLE OF ACT AS INDICATING INTENTION OF LEGISLATURE. The aim and scope of a legal enactment is always either generically or specifically set out in its title, and an act entitled "to prevent frauds upon travelers and owners of conveyances for the transportation of passengers" is not an act to regulate or control transportation companies, but an act passed in the interests of public morals to suppress fraud—a clear and unmistakable intent to exercise the police power.

6. CONSTITUTIONAL LAW—PRIVATE RIGHTS. Any law which declares it a crime for one citizen to sell to another that which is not injurious to the public health, morals or general welfare, is not only a dangerous and unjustifiable interference with the citizen's personal rights and liberty, but a violation of the constitution of this state. *Burdick v. People*, 149 Ill. 600, *distinguished*.

Petition for a writ of *habeas corpus*. Heard before Judge Edward F. Dunne. The facts are stated in the opinion of the court.

*Richard Prendergast*, attorney for relators.

*C. S. Deneen*, state's attorney, and *W. S. Forrest*, attorneys for defendants.

DUNNE, J.:—

Relators have been indicted in the criminal court of Cook county charged with violation of section two of what is commonly called the "Anti-Scalper Act" approved April 19, 1875, in force July 1st, 1875. The section reads as follows: "That it shall not be lawful for any person not possessed of such authority (to-wit, a certificate of authority to sell tickets, passes, etc., attested by the corporate seal of the owner of a railroad or steamboat mentioned in the first section of the

act) so evidenced, to sell, barter or transfer for any consideration whatever, the whole or any part of any ticket or tickets, passes, or other evidence of the holder's title to travel on any railroad or steamboat. * * *''

In the case at bar these relators have filed a petition for *habeas corpus,* in which the indictments are attacked on the sole ground that the law in question is unconstitutional and void.

To arrive at a determination of this question, it becomes important upon the threshold of the inquiry to determine what is a "ticket, pass or other evidence of the holder's right to travel on any railroad or steamboat." Special counsel for the state and railway corporations expressly disavows the contention that "a railway ticket is not personal property" (p. 76 of his Brief) but in the next breath says that it is not "a vendible chattel," but something in which the lawful owner has "property rights." How a person can have property rights in that which is not property this court cannot conceive. The concession by counsel that the lawful owner has property rights in the ticket carries with it the admission that such a pass or ticket is property. But counsel argues it is not a vendible chattel. In what sense? If the law under consideration is a valid and constitutional law, counsel is correct, for the law itself makes such tickets non-vendible. This it but begging the question. Strike this law from the statute books or hold it unconstitutional. Does counsel contend, in the absence of such a law, that a railway ticket or pass entitling the holder to travel is not vendible or negotiable? If such is his position he has not sustained the same either by logical argument or sound legal precedent.

Prior to the passage of this act, tickets and passes entitling the holder to ride upon a railroad or steamboat in the state of Illinois were as vendible and negotiable as a check or note payable to bearer, a horse, a cow, or any other chattel. The very object and aim of the act was to deprive them of their vendibility and make their sale a criminal offense.

In the absence of this statute, a railway ticket or pass en-

titling the holder to ride was a something in which, as counsel for the state admits, the holder had property rights. One of these property rights, in the judgment of this court, was the right to sell it in the open market for the highest price. That property right is sought to be taken away from the holder by this law, for while it provides for the redemption of such a ticket it fixes an arbitrary price for the same and deprives the holder of the right to sell in market overt. Fixing an arbitrary price upon a man's property and compelling him to sell at that price, is as clearly a violation of property rights as taking it from him without compensation.

Section 2, art. 11, constitution of Illinois, declares that "no person shall be deprived of life, liberty or property without due process of law." The right to buy and sell merchandise, chattels and other articles of value in market overt and at private sale, is property. But it is contended by the state that under the maxim, *"Salus populi, suprema lex"* the state may in the exercise of police powers deprive the citizen of his property without compensation or legal procedure.

No lawyer will dispute this contention. Where the possession of property, or the retention of his personal liberty become a menace to the health, morals or general welfare of the community at large, the state may deprive the citizen of both or either.

But in all such cases, it must be clear that the law which deprives the citizen of his property or liberty is within the police powers of the state. In other words it must be a law passed for the protection of the health, morals or general welfare of the community at large. How is this question to be determined? What tribunal is to decide whether or not a statute falls within or without the police power of the state? In the first instance, undoubtedly, the legislature. The legislature primarily also determines whether a law is or is not constitutional, for it cannot be presumed that a legislature would enact legislation which it knew to be unconstitutional and therefore nugatory. Nor can it be presumed that a legislature would pass a law depriving citizens of their private

property without due process of law which would be unconstitutional unless it believed that in so doing it was exercising the police power of the state. In both cases the legislature primarily decides that the laws are constitutional and within the police power respectively.

Is the decision of the law-making power in either case final and decisive? Most certainly not. If such were the case, no laws could be held to be unconstitutional by the courts; nor could any court have the right to determine the question as to whether or not any given law fell within or without the police power of the state. It would suffice for the legislature to declare in the enactment—no matter what might be its scope or subject-matter—this law is passed in the exercise of the police power of the state, or this law is passed for the preservation of public morals.

This seems to be the position taken by special counsel for the state. He argues that the legislature of Illinois in its wisdom has determined that the law was necessary for the preservation and protection of public morals and for the prevention of fraud and that its enactment would secure both, and that no court has a right to go behind and examine this finding. That such is not the law is shown by the fact that able and industrious counsel and conscientious and painstaking judges have for years past been endeavoring to ascertain and determine the limits and scope of the police power of the state, and declaring whether enactments are within or without its scope, and are so far from defining exact limits to the police power, as are the arctic explorers from the north pole.

Prentice in his recent work upon Police Powers, plainly recognizes the right of a court to determine whether any specific enactment falls within or without the police power. On page 6 of that work in speaking of the police power which he terms a "law of necessity," he says: "The law of necessity has been stated to be an exception to all human ordinances and constitutions, yet has been frequently decided to be subject to the law of reason and subject to the control of the courts." Again on page 7 the same author cites with ap-

proval the statement of Chief Justice Taney in the *License Cases*,[1] "that this power of government (to-wit, police power) inherent in every sovereignty * * * is not an uncontrollable or despotic authority, subject to no limitation exercisable * * * at the whim of the legislative body." Again on page 9 of his work he recognizes the same right of the court when he says: "The limits (i. e. of the police power) are not yet reached while we still advance, but the underlying principles by which the reason or unreason, or the constitutional limits of the authority claimed or used, may be investigated or judged, are now fortunately less obscure."

The same author, in speaking of the right of a state to protect itself under the police power from the introduction within its limits of paupers, vagrants, criminals, etc., declares (p. 10): "Such a right can only arise from a vital necessity for its exercise and cannot be carried beyond the scope of that necessity." Further on in the same work, the author declares: "we also see these police powers themselves under limitation. Besides judgment of 'common right and reason,' they may be tried in our country under two Constitutions, that of the United States and that of the State in which the question is raised." Page 268.

In the case *In re Jacobs*, 98 N. Y. 98, 110, the court declares: "Under the mere guise of police regulations personal rights and private property cannot be arbitrarily invaded and the determination of the legislature is not final or conclusive. If it passes an act ostensibly for the public health and thereby destroys or takes away the property of a citizen or interferes with his personal liberty, then it is for the courts to scrutinize the act and see whether it really relates to and is convenient and appropriate to promote the public health. * * * Such a declaration does not conclude the courts, and they must yet determine the fact declared and enforce the supreme law."

Even counsel for the state at a different place in his very exhaustive printed argument, unguarded—it appears to the

[1] 5 How. 583.—Ed.

court—admits the right of the courts to determine whether
or not a statute falls within the police power of the state
when he quotes approvingly the following language used by
Justice Field in the Powell case (*Powell v. Pennsylvania*, 127
U. S. 678) : "If that which is forbidden is not injurious to
the health or morals of the people, if it does not disturb peace
and menace their safety, it derives no validity by calling it a
police or health law." When Justice Field used this lan-
guage, he had under consideration and was endeavoring to
determine whether or not a certain legislative act was within
the police power of the state. If the legislature had the right
conclusively and finally to determine that its legislation was
within the police power of the state, why this language, and
why Mr. Forrest's commendation of the same.

This court is clearly of the opinion that when an act of
the legislature, passed ostensibly in the exercise of the police
power of the state, is submitted to a court for its construc-
tion in a proceeding in law or equity, that such court has a
right to determine whether or not it is a legitimate exercise
of the police power, particularly when, as in the case under
consideration, the legislation in question has the effect of se-
curing certain rights to one class of citizens and denying
them to all other citizens, and diminishing the value of what
was, prior to the passage of the act, legitimate, lawful and
freely negotiable property.

Is the act in question a legitimate exercise of the police
power of the state? If the provisions of the act carried out
the intention expressed in the title or caption, it would un-
questionably be within that power. An act whose provisions
in fact dealt with and prevented "frauds upon travelers and
owners of any railroad, steamboat, or other conveyance for
the transportation of passengers" as declared in the title of
the act, would clearly be a legitimate and proper exercise of
the police power. Let us examine the act and ascertain what
provisions it contains concerning frauds upon travelers or
transportation companies. Sec. 1 provides that transporta-
tion companies shall provide all their ticket agents with writ-

ten certificates of agency attested by the corporate seal.   Sec.
2 makes it unlawful for any person not having such certifi-
cates to sell—what?   Bogus tickets?   Forged tickets?   Ex-
pired tickets?   Tickets limited to a particular person?   No;
none of these.   It makes it unlawful for any person not hav-
ing such certificates of authority to sell "tickets, passes or
other evidence of the holder's title to travel" and these alone.
In other words it makes it unlawful to sell a ticket .good in
the hands of any one who honestly acquired it and which, up
to the time of the passage of the law, was a vendible, mer-
chantable commodity.   In what possible manner can the
making of such articles as a ticket, good in the hands of its
holder for a ride upon a railroad, unmerchantable and non-
salable, tend to the prevention of fraud upon travelers?   Does
the sale of such a ticket injure the public health, if it be un-
affected the fever germs or the public morals, unless upon
it there appears what is unchaste and lascivious?   Is it in
any way inimical to the public welfare to have such a ticket
sold by one citizen to another?   After, and as the result of
most careful deliberation, this court cannot conceive how the
sale of a "ticket, pass or evidence of holder's title to travel"
even in the remotest degree injures the public health, morals,
or public welfare.   The language of Judge Allen in *Thomas
v. Wabash R. R. Co.*, 40 Fed. 126, 133, is singularly appro-
priate to this law.   Speaking of another law with a similarly
deceptive title, he says: "The   *   *   *   act   *   *   *   has
not only a false and deceitful title, but its purpose was to con-
fer special privileges upon certain corporations and deny
to others of the same class the exercise of the same rights.
*   *   *   The act is in conflict with the 22nd section of the
fourth article of the constitution of Illinois.   *Frye v. Part-
ridge*, 82 Ill. 273; *People v. Cooper*, 83 Ill. 586; *People v.
Meech*, 101 Ill. 200; *Millett v. People*, 117 Ill. 305, 7 N. E.
631; Cooley's Const. Lim. 389–396."   To sustain such a law
as the exercise of the police power would amount to striking
out of our constitution the second and thirteenth sections of
the Bill of Rights, and overthrow the last barrier between
personal rights and corporate aggression.

But it is contended by counsel for the state and railway corporations that there is another ground aside from the claim that the law is a legitimate exercise of the police power upon which it must be held that the law is a valid and legal enactment, to-wit, that it is a law framed for the regulation of a business impressed with a public duty and performing certain quasi-public functions.

This contention has been pressed with great force and ability by counsel and is worthy of serious consideration. That corporations carrying on a business of quasi-public character, such as the operation of a railroad, ferries, canal, etc., are subject to legislative control and regulation, cannot be doubted, and if the law in question was passed for the purpose of, and did in fact control or regulate the management of railroads, steamboats and other means of transportation, it should be upheld by the courts.

Let us examine the law first in relation to the intention of the legislature, and second, as to the effect of the law with reference to the claim that it is a regulation of the business of transportation.

The legislature which passed the act probably knew the aim and intent of the act better than either court or counsel, and the aim and scope of legal enactment is always either generically or specifically set out in its title. Following the usual practice the legislature of Illinois declared the aim and scope of this act in its caption. It is there declared to be an act—not to regulate or control transportation companies, but an act "to prevent frauds upon travelers and owners of conveyances for the transportation of passengers." In other words, the legislature enacting the law declares it to be an act passed in the interests of public morals to suppress fraud —a clear and unmistakable intent to exercise the police power. If it was intended to be a law for the regulation of transportation companies, the legislature would have so declared it in its title. It was clearly not the intention of the legislature to regulate transportation companies, and in sections two and three of the act, which are the vital sections thereof, and the sections under which relators have been indicted, no pretense

is made of regulating them.   These sections do not apply in
letter or spirit to transportation companies, but cover and
apply to all citizens of the state in general, no matter whether
they are engaged in the transportation business or any other
business.   It lays the heavy hand of law not only on ticket
brokers, who are unconnected with transportation companies,
but upon any and every citizen who having honestly come by
a ticket entitling its holder to travel, honestly attempts to
dispose of the same.

It would undoubtedly be an exercise of the right to control
quasi-public corporations for a legislature to impose lawful
conditions upon the original sale of a ticket by a transporta-
tion company to a purchaser, but once a ticket has issued en-
titling a "holder" to ride and therefore transferable by de-
livery, any legislation in reference to the future disposal
thereof is not an exercise of the power to regulate and control
corporations impressed with a public duty, but a bold and
unwarranted interference with the property rights of citi-
zens.   The legislature has the undoubted right to control and
regulate horse car companies.   Yet if the legislature under
the pretended exercise of this right should declare it to be a
criminal offense for a horse dealer or other citizen to sell a
horse which had been honestly acquired by purchase from
the company, would counsel contend that such a law was con-
stitutional?   That he would not is shown by his own argument.
On pages 49 and 50 of his brief in sustaining his position
that the act is not in contravention of the Interstate Com-
merce Act, he declares: "A ticket offered for sale to or by a
ticket broker is, when so offered, wholly separate and distinct
from the function it performs in the hands of a traveler on
a train and depending upon it as evidence of his right to
transportation.   It is, when so offered for sale, merged in the
common mass of the vendible chattels in the state (if we con-
sider it such a chattel) to the same extent as is any other
article sold or offered to be sold by or to an inhabitant of the
state.   When so offered, even if we consider it a chattel, it is
like, for instance, a piece of cloth bought from a merchant in

a foreign nation by Marshall Field or from an inhabitant of
Illinois by Marshall Field, and by Marshall Field exposed
for sale.''

The court cannot state its view of the condition of a ticket
''entitling holder to ride'' after it has once been purchased
from a transportation company and the holder thereof, in
clearer language than has Mr. Forrest in the foregoing quota-
tion.   Sections 2 and 3 of this act under which relators are
indicted do not regulate or control in any way transportation
companies, and they cannot be sustained under the claim that
they were enacted for the purpose of regulating corporations
impressed with a public duty.   They do, however, affect to
control the whole body of the citizens of the state in imposing
restrictions and limitations upon their right to buy and sell
property.   This the law-making power can only do in the
legitimate exercise of the police power, and, as this court has
theretofore declared, the law in question does not fall within
the limits of the police power.

In arriving at this conclusion, the court has not failed to
examine and give full consideration to the cases cited by the
counsel for the state, which declare similar laws valid and
constitutional.   The case of *Burdick v. People,* 149 Ill. 600,
might in the absence of the extraordinary record disclosed in
the majority and dissenting opinions in *In re Burdick,* 162
Ill. 48, be conclusive in favor of the state's position.   But in
view of the fact that the majority opinion in the latter case
declares (p. 50) that, ''Along with the petition, numerous
affidavits were filed which tended to prove the truth of the
statements made in said petition, that the petition upon its
face discloses that the case of *Burdick v. People,* reported in
149 Ill. 600, was outrageously fraudulent and collusive, that
the majority of the court did not find it necessary   *   *   *
to weigh the testimony   *   *   *   for the purpose of deter-
mining whether or not the prosecutions against George Bur-
dick were fictitious and collusive,'' (p. 51), that the minority
of the court did consider and weigh the evidence, and were
of the opinion that the cases were fraudulent and collusive,

and that the majority opinion contains the singular and un-
usual declaration that the "opinion of the court in the Bur-
dick cases are conclusive only as between the parties in those
cases, and are no estoppel as between the people of the state
of Illinois and the petitioners" (p. 58 of majority opinion);
this court does not consider itself bound by the reasonings
and conclusions in the opinion rendered in *Burdick v. People*.
The opinion cited in *Commonwealth v. Wilson*, 14 Phila. 384,
was rendered by a single judge—Ludlow—sitting in the
court of quarter sessions. He holds that an enactment sim-
ilar to the Illinois statute was within the police powers, but
cites no authorities in support of his holding, the only au-
thorities cited being in support of the position that a state
may exercise its police powers notwithstanding that provision
of the federal constitution giving to congress the right to
regulate commerce between the states.

In *Fry v. State*, 63 Ind. 555, the supreme court of Indiana
declared an act in some respects similar to the Illinois act a
legitimate exercise of the police power and a valid law, al-
though the title of the law, to-wit, "An act regulating the is-
suing and taking up of tickets and coupons of tickets by com-
mon carriers, and defining the rights of holders thereof, and
other matters in relation thereto," and the provisions of the
act regulating the same show that it was passed under the
power of the state giving it the right to regulate quasi-public
corporations impressed with public duties, rather than in the
strict exercise of the police power. The Indiana act contains
several regulations imposing restrictions upon transportation
companies and favorable to the public, such as requiring
restrictions upon the rights of ticket holders to be printed in
nonpareil type and the redemption of tickets at each agency,
and in these respects much more nearly approaches the legiti-
mate exercise of the power to regulate municipal corporations
than the Illinois law, and these considerations doubtless had
their effect upon the court in passing upon the law in its en-
tirety.

In *State v. Corbett*, 59 Minn. 345, the supreme court of

Minnesota, two of the five justices being absent, have also upheld a similar law as a valid exercise of the police power upon the authority of the Fry and Burdick cases, although the title of the act, to wit: "An act to regulate the sale and redemption of transportation tickets of common carriers and to provide punishment for the violation of the same," shows it was the intention of the legislature to regulate common carriers rather than to enforce police power in its strict sense.

The appellate division of the supreme court of New York has also recently, in the case of *People, ex rel. Tyroler v. Warden*, 26 App. Div. 228, 50 N. Y. S. 56,[1] following and relying on the Burdick, Corbett and Wilson cases, held a similar law in that state a legitimate exercise of the police power, and although the court has carefully considered the arguments and reasoning contained in the opinions rendered in those cases, it cannot arrive at the conclusion reached by those courts, that the sale of a ticket entitling the holder thereof to ride, by one citizen to another, tends in any way to injure the health, morals or general welfare of the community, and that legislation making such sales a criminal offense is an honest and legitimate exercise of the police power of the state. Until the supreme court of this state, upon a case presented to it by parties who are in fact, adversely interested in the outcome, shall declare such law within the police power of the state, this court holds to the view that this law, or any law which declares it a crime for one citizen to sell to another that which is not injurious to the public health, morals or general welfare, is not only a dangerous and unjustifiable interference with the citizen's personal right and liberty, but a violation of the constitution of this state. Nor in holding these views does this court stand alone. In *Austin v. Murray*, 16 Pick. 121, 126, it is said: "The law will not allow the rights of property to be invaded under the guise of a police regulation for the promotion of health, when it is manifest that such is not the object and purpose of the regulation." And Justice Field, in the celebrated *Slaughter House Cases*, 16 Wal-

[1] *Burdick v. People*, 149 Ill. 600, *distinguished.*

lace, 36, says: "Under the pretense of prescribing a police regulation, the state cannot be permitted to encroach upon any of the just rights of the citizen which the constitution intended to secure against abridgment." And Judge Colt, in *Watertown v. Mayo*, 109 Mass. 315, 319, declares: "The law will not allow rights of property to be invaded under the guise of a police regulation for the preservation of health or protection against a threatened nuisance, and when it appears that such is not the real object and purpose of the regulation, courts will interfere to protect the rights of the citizen."

In the language of the New York Court of Appeals, in *Re Jacobs*, 98 N. Y. 98, 115, which was also a *habeas corpus* case which called in question the constitutionality of a police law: "When a health law is challenged in the courts as unconstitutional, on the ground that it arbitrarily interferes with personal liberty and private property without due process of law the courts must be able to see that it has at least in fact some relation to the public health.  *  *  *  This we have not been able to see in this law, and we must, therefore, pronounce it unconstitutional and void. In reaching this conclusion we have not been unmindful that the power which courts possess to condemn legislative acts which are in conflict with the supreme law should be exercised with great caution, and even with reluctance. But, as said by Chancellor Kent (1 Com. 450) : 'It is only by the free exercise of this power that courts of justice are enabled to repel assaults and to protect every part of the government and every member of the community from undue and destructive innovations upon their charter rights.' "

(The court remanded the relators, pursuant to the rule laid down by the state supreme court in *People v. Jonas*, 173 Ill. 316, that the constitutionality of a statute could not be considered in a habeas corpus proceeding.)

### NOTE.

The above case is referred to in a note upon anti-ticket scalping laws in 4 L. R. A. (n. s.) 480, collecting the cases in the lower Illi-

nois courts holding the Illinois act unconstitutional. See, also, the other cases in this volume upon this subject. *People v. Walser*, 3 Ill. C. C. —; *People ex rel. Geis v. Pease*, 3 Ill. C. C. —; *People ex rel. Frank v. Pease*, 3 Ill. C. C. —; *People ex rel. Marks v. Pease*, 3 Ill. C. C. —; *People v. Ullman*, 3 Ill. C. C. —; *People v. Gilbert*, 3 Ill. C. C. 61.

The case of *Burdick v. People*, 149 Ill. 600, which many of the above cases refused to follow, was, however, cited with approval by the supreme court in *City of Chicago v. Oppenheim*, 229 Ill. 317, 319, 321 (1907); and in *Steele v. People*, 231 Ill. 340 (1907), where the state law prohibiting resales of theater tickets at an increased price was held unconstitutional and void.—Ed.